Paul E. SCOTT et al.,
Plaintiffs-Appellees,

v.

Bill MOORE et al., Defendants,

Laborers International Union of North
America, Local No. 870 et al.,
Defendants-Appellants,

International Union of Operating
Engineers, etc., AFL–CIO, Local
450, Defendant-Appellant.

No. 79–1196.

United States Court of Appeals,
Fifth Circuit.

March 26, 1981.

Martin W. Dies, Orange, Tex., William N. Wheat, Paul F. Waldner, Houston, Tex., for IUOE, Local 450.

Robert Q. Keith, Arthur R. Almquist, Beaumont, Tex., for plaintiffs-appellees.

Before CHARLES CLARK, TJOFLAT and GARZA, Circuit Judges.

CHARLES CLARK, Circuit Judge:

This appeal presents important questions concerning the scope of relief available under 42 U.S.C. § 1985(3), the extent of congressional power to enact a civil remedy for wholly private infringement of constitutional rights, and the relationship between section 1985(3) and the labor relations laws. The district court issued a permanent injunction against the defendants, including numerous labor organizations. It also awarded money damages for violations of section 1985(3), concluding that the statute afforded a remedy for the kind of private conspiracy involved here and that Congress was constitutionally empowered to provide such a remedy. For the reasons stated below, we affirm in part and reverse in part.

I. THE FACTUAL BACKGROUND

This case arises out of an episode of mob violence that occurred in the early morning hours of January 17, 1975. The plaintiffs are A. A. Cross Construction Company, Inc., and two of its employees, Paul Scott and James Matthews. The defendants include the Sabine Area Building and Construction Trades Council, a loose confederation of craft and construction unions located in the Port Arthur, Texas, area. Also named as defendants are twenty-five of the Council's member unions and several individual members of some of these labor unions. The individual defendants are not parties to this appeal. The plaintiffs contend that the defendants conspired for the purpose of depriving them of the equal protection of the laws and equal privileges and immunities under the law when they planned and exe-cuted an attack on the Cross construction site, assaulting workers and destroying property.

A. A. Cross Construction Company is a Texas corporation engaged in the building and construction industry as a general contractor. In May, 1974, Cross contracted with the Department of the Army, United States Corps of Engineers to erect the Alligator Bayou Pumping Station and Gravity Drainage Structure on the hurricane levee along Taylor's Bayou near Port Arthur. The agreement had a contract price in excess of $8 million and called for the construction of the pump station with four pumps and a gravity drain for flood control. In accordance with its customary practice, the Cross Construction Company hired its workers for the Alligator Bayou project without regard to union affiliation, employing persons solely on the basis of its own need for the applicant's occupational skills. Cross did not have a collective bargaining agreement with any labor union, and when this incident occurred no union was seeking to organize the company's employees. In addition, Cross often hired workers from outside the Port Arthur community.

Cross Construction Company's hiring practices provoked an antipathetic response from some segments of the Port Arthur community. In fact, on several occasions prior to the eruption of violence on January 17, popular enmity had risen to the level of warnings and threats directed against Cross and its employees. Local residents had confronted Cross employees at a local tavern and pool hall frequented by them, threatening to place pickets at the construction site, promising to make Cross "go union," and occasionally warning of trouble if Cross did not cease hiring nonunion laborers. About three months before the January 17 attack, one of the individual defendants, Bill Moore, approached Mr. Cross and threatened that he would "hurt you bad," saying, "What is going to happen when that big rig of yours down there burns up?" On another occasion, John Wallace, financial secretary and business representative for the

Carpenters Local 610, had told Cross that "this is union country" and that if he persisted in using nonunion labor it was "going to cost you a million dollars."

Meanwhile, during the months preceding the January 17 violence, rumors began to develop concerning a "citizens protest" to be staged at the Alligator Bayou construction site. These rumors contemplated a public demonstration to call attention to the fact that Cross hired nonunion labor and did not have a labor contract with any union as well as to protest the company's policy of hiring employees from outside the Port Arthur community.

There is no direct evidence to show the organizing force behind this protest demonstration, but on Wednesday, January 15, two days before the assault on the Cross jobsite, the Sabine Area Building Trades Council held its regular weekly meeting. Cross Construction Company's indifference to prospective employees' union status and its lack of a union contract had long been topics of concern at the Council's meetings, and they were once again discussed during the January 15 session. In addition, the group discussed the rumored citizens protest, and some of the union representatives in attendance informed the Council that the demonstration had apparently been scheduled for the following Friday.

On Thursday, the sixteenth, Cross Construction Company learned of the scheduled protest from two union employees associated with the Alligator Bayou project. Fred Dukes, a member of Cement Masons Local 884, worked for Cross as a cement finisher on a two-day job. Earl Stevens, a member of Plumbers Local 504, worked as a foreman for Cross Construction Company's mechanical subcontractor. Both men received warnings from their respective union business agents about a possible picket or demonstration to be held at the Cross construction site, and both men passed that information along to Cross. Neither Dukes nor Stevens had heard anything about violent or destructive conduct. Nevertheless, Cross directed its employees to report for work at 6:00 a. m. on Friday, an hour earlier than usual, in order to avoid any confrontation between them and the demonstrators.

On the morning of January 17, after most of the Cross employees had arrived at work, a crowd of nearly three hundred people assembled at the main access road leading to the Cross construction site. Several vehicles made brief forays up the access road, and their occupants confirmed with Cross and Scott that they were at the Cross Construction Company jobsite. The crowd began to get unruly, pushing and shoving the remaining Cross workers as they arrived. Nevertheless, Cross's employees began work as usual. Then, shortly after 7:00 that morning, a group of four pickup trucks, each carrying between twelve and eighteen persons, emerged from the crowd gathered at the access road and drove onto the jobsite. Plaintiff Scott went out to meet the intruders and to request them to leave the area, but one of them approached Scott and said, "Man, you all have got to be crazy . . . this is a union town." Scott told his interlocutor that they did not want any trouble, and he attempted to gather together the other employees and to leave the jobsite. However, before he could complete his mission, someone stepped out of the group and struck him on the head. Suddenly, the mob swarmed over the construction site, brutally beating Cross and his employees with iron rods and wooden boards, overturning and setting fire to the trailer that served as the construction site office, smashing automobile and truck windshields, and vandalizing company tools and equipment. The entire episode lasted only a few minutes, but the destruction was devastating. Cross and his employees were treated for their injuries at a local hospital, and work at the construction site did not resume for nearly three weeks. Some of Cross's employees, frightened by the possibility of repeated attacks at the jobsite, refused to return to work. In addition, the violence and vandalism delayed the completion of the project by about six months, ultimately causing the Cross Construction Company to default in its contractual obligation to the U. S. Army Corps of Engineers.

On January 31, 1975, plaintiffs Scott and Matthews initiated this lawsuit against the individual defendants. They sought and obtained a temporary injunction retraining the then-named defendants and "all persons, firms, and associations combining or conspiring with defendants" from further violent, intimidating, or destructive acts against employees at the Alligator Bayou Pump Station project. Nearly two years later, the plaintiffs amended their complaint, adding A. A. Cross Construction Company, Inc., as plaintiff and the Sabine Area Building and Construction Trades Council along with twenty-five local unions as defendants. The district court found that the plaintiffs had proved a conspiracy to deprive them of the equal protection of the laws, permanently enjoined the building trades council and twenty-four of the unions from future misconduct, and assessed damages against eleven of the union defendants.[1]

## II. THE JURISDICTIONAL QUESTION: INJUNCTIVE RELIEF AND THE NORRIS–LAGUARDIA ACT

The district court issued a permanent injunction against the Sabine Area Building and Construction Trades Council, twenty-four of its member unions, and all persons conspiring with them. The court's injunction ordered that those parties subject to its terms

> ... shall not hereafter combine, conspire, threaten, intimidate, assault, or commit any act of violence toward or upon any person, property or possession of any person or his family who may work upon, travel to, deliver materials, goods, or services to A. A. Cross Construction Co., Inc., or to the site of the alligator Bayou

Pump Station on Taylor's Bayou near Port Arthur, Jefferson County, Texas.

The defendants contest the district court's power to issue such an injunction, arguing that the Norris-LaGuardia Act deprives the district court of jurisdiction to enjoin labor organizations from engaging in conspiratorial conduct. They maintain that the unembellished language of the Act is sufficient to show the court's usurpation of authority.

■ We disagree. The Norris-LaGuardia Act was passed for the purpose of limiting the circumstances and conditions under which injunctive action could be taken against labor organizations in the context of a labor dispute. The labor injunction had been an important device used by employers to counter organized labor's most effective economic weapons, strikes, boycotts, and picket lines. However, the Act was predicated on the conviction that labor disputes turned on issues of social and economic policy that could not appropriately be resolved by the courts. The legislative solution to the problems confronting workers in a complex industrial economy was union organization and collective bargaining. Since the ready issuance of labor injunctions presented a serious obstacle to the concerted activities of organized workers, Congress decided to remove the federal judiciary from labor disputes. Thus, section 5 of the Act, 29 U.S.C. § 105, limits the equitable power of the federal courts in the following way:

> No court of the United States shall have jurisdiction to issue a restraining order or temporary or permanent injunction upon the ground that any of the persons participating or interested in a

1. The district court assessed damages against the following eleven unions: Laborers International Union of North America, Local 870; Operative Plasters and Cement Masons International Association, Local 884; United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Local 195; United Brotherhood of Carpenters and Joiners of America, Local 610; United Brotherhood of Carpenters and Joiners of America, Local 753; International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers, and Helpers, AFL–CIO, Local 587; International Association of Bridge Structural and Ornamental Ironworkers, Local 125; Sheet Metal Workers International Association, Local 196; Carpenters District Council of Sabine Area; International Brotherhood of Electrical Workers, Local 479; and International Union of Operating Engineers, Hoisting and Portable Engineers, AFL–CIO, Local 450.

labor dispute constitute or are engaged in an unlawful combination or conspiracy because of the doing in concert of the acts enumerated in section 104 of this title.

29 U.S.C. § 105.

■ But the Act does not impose an unqualified prohibition against federal injunctive relief. Section 105 merely restricts the court's power to enjoin concerted or conspiratorial activity where the conduct to be enjoined is an act enumerated in section 104.[2] The enumerated acts include refusing to work, joining a labor organization, paying or withholding strike benefits from a labor disputant, lawfully giving aid to a labor disputant who is prosecuting or defending a court action, truthfully and peacefully publicizing a labor dispute, peacefully assembling to promote one's interests in a labor dispute, and agreeing with or inducing other persons to do any of those acts. In short, section 104 interdicts injunctive relief against the legitimate activities of labor unions. However, there is nothing in this provision denying to federal courts

the power to enjoin violence, breaches of the peace, or criminal acts simply because they may be committed by persons participating or interested in a labor dispute.

■ In fact, the Norris-LaGuardia Act itself implicitly recognizes the threatened commission of violent acts as a condition under which an injunction may issue. Section 107 states that no court of the United States has jurisdiction to grant an injunction, unless, after a hearing, the court finds "[t]hat unlawful acts have been threatened and will be committed unless restrained...." 29 U.S.C. § 107(a). Thus, violence, intimidation, threats, vandalism and combinations or conspiracies to commit such acts may be restrained and enjoined even though they arise in connection with a labor dispute. *See, e. g., Westinghouse Broadcasting Co. v. Dukakis*, 412 F.Supp. 580 (D.Mass.1976); *Potomac Electric Power Co. v. Congress of Racial Equality*, 209 F.Supp. 599 (D.D.C.1962). The Norris-LaGuardia Act does not divest the district court of jurisdiction to enjoin the kind of violent conduct present in this case.[3]

---

**2.** Section 104 provides as follows:

No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

(a) Ceasing or refusing to perform any work or to remain in any relation of employment;

(b) Becoming or remaining a member of any labor organization or of any employer organization, regardless of any such undertaking or promise as is described in section 103 of this title;

(c) Paying or giving to, or withholding from, any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or other moneys or things of value;

(d) By all lawful means aiding any person participating or interested in any labor dispute who is being proceeded against in, or is prosecuting, any action or suit in any court of the United States or of any State;

(e) Giving publicity to the existence of, or the facts involved in, any labor dispute,

whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;

(f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;

(g) Advising or notifying any person of an intention to do any of the acts heretofore specified;

(h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and

(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, regardless of any such undertaking or promise as is described in section 103 of this title.

29 U.S.C. § 104.

**3.** Even where jurisdiction to grant injunctive relief is authorized, the Norris-LaGuardia Act imposes strict procedural requirements upon the court. *See* 29 U.S.C. §§ 107–109; *New Negro Alliance v. Sanitary Grocery Co.*, 303 U.S. 552, 561–62, 58 S.Ct. 703, 707, 82 L.Ed. 1012, 1016 (1938). The unions have raised no objections to the procedures employed by the district court in this case.

### III. THE STATUTORY QUESTION: THE SCOPE OF REMEDY UNDER 42 U.S.C. § 1985(3)

#### A. *Griffin v. Breckenridge*

Section 1985(3) was originally enacted by Congress as a part of the Ku Klux Klan Act in order to enforce the Civil War amendments to the Constitution and to provide a means of redress for persons victimized by the Klan's acts of terror and intimidation. The statute imposes civil liability on persons conspiring to deprive another person or class of persons of "the equal protection of the laws, or of equal privileges and immunities under the laws."[4] Narrow judicial construction made section 1985(3) a seldom-used remedy during the first century after its enactment. *See, e. g., Collins v. Hardyman*, 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253 (1951). However, the Supreme Court decided in 1971 to "accord to the words of the statute their apparent meaning" and held section 1985(3) provided a civil remedy for damages against wholly private infringements of constitutionally protected rights. *Griffin v. Breckenridge*, 403 U.S. 88, 97, 91 S.Ct. 1790, 1795, 29 L.Ed.2d 338, 345 (1971). In *Griffin*, a group of whites assaulted three black men along a Mississippi highway in the mistaken belief that their victims were the associates of a civil rights worker. The blacks brought an action under section 1985(3) to redress violations of the laws of the United States and of Mississippi, including the rights of free speech, assembly, association, interstate travel, liberty, and security of their persons. The Supreme Court first held that the text of the statute, recent judicial interpretations given to related civil rights provisions, the complementary relationship of the various civil rights statutes, and the legislative history surrounding section 1985(3) all "point unwaveringly to § 1985(3)'s coverage of private conspiracies." 403 U.S. at 101, 91 S.Ct. at 1798, 29 L.Ed.2d at 347.

■ While eliminating the state action requirement, the *Griffin* court was concerned that the statute, if applied too broadly, would displace many areas of tort law that have traditionally been reserved to the states and thereby violate constitutionally-based principles of federalism. "That the Statute was meant to reach private activity does not ... mean that it was intended to apply to all tortious, conspiratorial interferences with the rights of others." 403 U.S. at 101, 91 S.Ct. at 1798, 29 L.Ed.2d at 347. Accordingly, the Court read section 1985(3) to apply only to actions which are inspired by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." 403 U.S. at 102, 91 S.Ct. at 1798, 29 L.Ed.2d at 348. It then delineated four elements necessary for a plaintiff to establish a § 1985(3) cause of action:

(1) the defendants must conspire or go in disguise on the highway or premises of another;

(2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and

(3) one or more of the conspirators must commit some act in furtherance of the conspiracy; whereby

(4) another is either (a) injured in his person or property or (b) deprived of having and exercising any right or privilege of a citizen of the United States.

*See id.* at 102–03, 91 S.Ct. at 1790, 29 L.Ed.2d at 348. Subsequently, this court has added a fifth element,

---

4. The relevant part of section 1985(3) reads as follows:

 If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class or persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

 42 U.S.C. § 1985(3)

(5) that the conspirators' conduct must be unlawful independent of the section 1985(3) violation.

See *McLellan v. Mississippi Power & Light Co.*, 545 F.2d 919 (5th Cir. 1977) (en banc).

The *Griffin* court, having concluded that the plaintiffs had stated a cause of action under section 1985(3), then sought to locate a source of congressional power to reach the private conspiracy alleged. The sources identified in *Griffin* were the Thirteenth Amendment and the constitutional right to travel. 403 U.S. at 104–06, 91 S.Ct. at 1799–1800, 29 L.Ed.2d at 349–50. The Court observed, however, that other provisions of the Constitution, including section 5 of the Fourteenth Amendment, might empower Congress to reach other conspiracies by private persons. *Id.* at 107, 91 S.Ct. at 1801, 29 L.Ed.2d at 351. However, the Court found the facts of that case made it unnecessary to look beyond the Thirteenth Amendment and the right to interstate travel.

### B. *The Present Case*

*Griffin's* principles indicate the plaintiffs here have made out a cause of action under section 1985(3). The facts of this case clearly embody four of the five elements essential to a successful § 1985(3) claim. First, the evidence is sufficient to establish a conspiracy among some of the Council's constituent unions and individual defendants. Second, proof that plaintiffs were assaulted, beaten, and threatened and that property was destroyed establishes the requisite "act in furtherance" of the conspiracy. Third, these acts are indisputably illegal apart from § 1985(3) as required by *McLellan.* Fourth, there is evidence of personal injuries, property damage, and economic loss. The only element requiring analysis is the requirement that the conspiracy be for the purpose of depriving a person of the equal protection of the laws or equal privileges and immunities under the laws. This requirement, in turn, has two components: (1) the violation of some protected right and (2) a class-based, invidiously discriminatory animus motivating the violation.

### 1. *Violation of a Protected Right*

In *Griffin*, the Supreme Court stated that a § 1985(3) conspiracy "must aim at a deprivation of the equal enjoyment of rights secured by the law to all." 403 U.S. at 102, 91 S.Ct. at 1798, 29 L.Ed.2d at 348. The plaintiffs in the case at bar contend that the object of the defendants' conspiracy was to deprive them of their First Amendment right to associate with their fellow nonunion employees. They argue that curtailment of their interests secured by the First Amendment is a deprivation of equal protection of the laws within the meaning of section 1985(3) as interpreted by *Griffin.*

▇▇▇ The Ku Klux Klan Act was originally entitled, "An Act to Enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for Other Purposes." 17 Stat. 13 (1871). The guaranties afforded by the First Amendment are protected by the due process clause of the Fourteenth Amendment. *E. g., Williams v. Rhodes,* 393 U.S. 23, 30–31, 98 S.Ct. 5, 10, 21 L.Ed.2d 24, 31 (1968); *New York Times v. Sullivan,* 376 U.S. 254, 276–77, 84 S.Ct. 710, 724, 11 L.Ed.2d 686, 704 (1964); *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213, 1217 (1940); *De Jonge v. Oregon,* 299 U.S. 353, 364, 57 S.Ct. 255, 260, 81 L.Ed. 278, 283 (1937). Moreover, the right of free association is closely aligned with the right of free speech and is similarly protected by the First Amendment. *E. g., Abood v. Detroit Board of Education,* 431 U.S. 209, 233, 97 S.Ct. 1782, 1798–99, 52 L.Ed.2d 261, 283 (1977); *Healy v. James,* 408 U.S. 169, 181, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266, 279 (1972); *Baird v. State Bar of Arizona,* 401 U.S. 1, 6, 91 S.Ct. 702, 705, 27 L.Ed.2d 639, 646 (1971); *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 462, 78 S.Ct. 1163, 1171–72, 2 L.Ed.2d 1488, 1499 (1958).

The defendants urge that section 1985(3) does not provide a remedy for private interference with First Amendment freedoms. They appeal to the well-established principle that the Fourteenth Amendment "erects no shield against merely private conduct,

however discriminating or wrongful." *Shelley v. Kraemer*, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161, 1180 (1948). To support their construction of section 1985(3), the defendants rely upon several decisions of the Seventh Circuit. In *Dombrowski v. Dowling*, 459 F.2d 190 (7th Cir. 1972), the court held that section 1985(3) does not afford protection against private deprivations of rights protected under the Fourteenth Amendment absent some kind of state involvement. Emphasizing the historical connection between sections 1983 and 1985(3), the court decided that it is necessary to identify the interests which Congress intended to protect from unequal treatment as well as the kinds of conduct which it meant to proscribe.

> The breadth of the statute's coverage is yet to be determined, but three categories of protected rights have been plainly identified. *Griffin* gives express recognition to a black citizen's Thirteenth Amendment rights and to his federal right to travel interstate; the title of the statute expressly identifies the third category, namely, rights protected by the Fourteenth Amendment. We think the § 1983 cases make it clear that in this third category a "state involvement" requirement must survive *Griffin*.

459 F.2d at 195 (footnotes omitted).[5] Subsequently the Seventh Circuit has extended the *Dombrowski* rationale in *Murphy v. Mount Carmel High School*, 543 F.2d 1189 (7th Cir. 1976), expressly holding that section 1985(3) provides no remedy for purely private impairment of First Amendment speech and associational freedoms. *Accord Bellamy v. Mason's Stores, Inc.*, 508 F.2d 504 (4th Cir. 1974).

The Seventh Circuit's reasoning is contrary to the Supreme Court's analysis in *Griffin*. Of course, most basic constitutional provisions impose limitations on the power of government to regulate private conduct. Thus, the rights they confer on individuals are typically rights of the individual against the state. But the *Griffin* court, after acknowledging the conceptual difficulties associated with private deprivations of constitutional rights, construed section 1985(3) to reach both public and private constitutional wrongs.

> A century of Fourteenth Amendment adjudication has ... made it understandably difficult to conceive what might constitute a deprivation of the equal protection of the laws by private persons. Yet there is nothing inherent in the phrase that requires the action working the deprivation to come from the State. Indeed, the failure to mention any such requisite can be viewed as an important indication of congressional intent to speak in § 1985(3) of *all* deprivations of "equal protection of the laws" and "equal privileges and immunities under the laws," *whatever their source.*

403 U.S. at 97, 91 S.Ct. at 1796, 29 L.Ed.2d at 345 (citation omitted and some emphasis supplied). Thus, *Griffin* made it unmistakably clear that section 1985(3) was intended to provide a remedy for all private conspiracies. "It is thus evident that all indicators —text, companion provisions, and legislative history—point unwaveringly to § 1985(3)'s coverage of private conspiracies." *Id.* at 101, 91 S.Ct. at 1798, 29 L.Ed.2d at 347.[6] The *Griffin* Court's method of analysis and the unequivocal language of its opinion foreclose our adoption of the approach taken by the Seventh Circuit.

---

**5.** *Dombrowski* recognizes that there is no statutory requirement of state participation or support for the conduct of the conspirators, *i. e.*, that there is no requirement that the defendants act under color of state law. However, where one suffers a deprivation of a federally created right which necessarily includes some component of state action, *Dombrowski* holds that such state action is also a necessary ingredient of the section 1985(3) cause of action. *See* 459 F.2d at 194–95.

**6.** Technically, of course, this language is dicta. *Griffin* grounded its decision on the rights secured to black citizens under the Thirteenth Amendment and the right to inter state travel, both of which operate as limits on individual conduct as well as state conduct. However, we believe that the language and reasoning of *Griffin* on this issue are sufficiently indicative of the Supreme Court's approach to be regarded as dispositive.

In addition, the interpretation given to the statute in this circuit makes that approach unnecessary. Although *Griffin* found that section 1985(3) covered purely private conspiracies, it did not announce what might constitute a deprivation of equal protection by private persons. Uncertainty in this regard may have contributed to the Seventh Circuit's decision to retain some form of state involvement as a part of the § 1985(3) cause of action. *See Dombrowski*, 459 F.2d at 194. However, this circuit has adopted a different tack. *McLellan* establishes that section 1985(3) was not intended to redress every conceivable private interference with another's rights. Rather, "the object of a section 1985(3) conspiracy must be to deprive another of the enjoyment of legal rights by independently unlawful conduct." *McLellan*, 545 F.2d at 927 (footnote omitted). The independent illegality requirement was derived in part from the passage in *United States v. Harris*, 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290 (1883), which explains that the only method by which a "private person can deprive another of the equal protection of the laws is by the commission of some offense against the laws which protect the rights of persons, as by theft, burglary, arson, libel, assault, or murder." *Id.* at 643, 1 S.Ct. at 612, 27 L.Ed. at 295. In this way, *McLellan* limited the potentially boundless reach of the statute and provided meaning to the concept of a private impairment of constitutional rights. Therefore, *McLellan* resolved the difficulties perceived by the *Dombrowski* court and made its analysis unnecessary.

■ It cannot be gainsaid that the defendants' conspiracy comprehended an intent to violate the law independent of section 1985(3). The plaintiffs contend that the conspiracy was calculated to deprive them of the right to freely associate with other nonunion laborers. They have alleged and have sought to prove that the defendants conspired to accomplish this object by assaulting and beating them with wooden boards and iron bars; by destroying tools, equipment, and automobiles; and by overturning and setting fire to the Cross office trailer. The means adopted by the conspirators to deprive the plaintiffs of their rights of free association encompass patent violations of both the civil and criminal laws of Texas. *See, e. g.*, Tex.Penal Code Ann. §§ 22.01 (assault); 22.02 (aggravated assault); 28.02 (arson); 28.04 (reckless damage or destruction) (Vernon 1974). *See generally* W. Prosser, Law of Torts §§ 9–10 (assault and battery); 14 (trespass to chattels). The plaintiffs also offered proof that the conspirators engaged in the very unlawful conduct they conspired to commit and that as a result plaintiffs suffered injury to their persons and property. Under such circumstances, we conclude that section 1985(3) affords a remedy for purely private conspiracies aimed at denying their victims the First Amendment right of free association.[7]

### 2. *Discriminatory, Class-Based Animus*

The plaintiffs have also satisfied *Griffin's* class-based, discriminatory animus component of the § 1985(3) cause of action. Our analysis involves two distinct but closely related questions. First, does section 1985(3) coverage extend to private conspiracies founded upon some invidiously discriminatory animus other than racial prejudice? Second, if it does, is the particular class to which the plaintiffs belong, nonunion workers and their employers, one which falls within the statute's protective ambit? We answer both these questions in the affirmative.

---

**7.** Because of our disposition of the case, it is not necessary to decide whether section 1985(3) also protects against private conspiracies to deny rights secured under state law. *See Life Insurance company of North America v. Reichardt*, 591 F.2d 499 (9th Cir. 1979) (holding violations of state antidiscrimination statute cognizable). It is also unnecessary to de-cide whether federal *statutory* rights are protected by § 1985(3). *See Novotny v. Great American Federal Savings & Loan Ass'n*, 584 F.2d 1235 (3d Cir. 1978), *rev'd*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979) (violations of Title VII). *Cf. McLellan*, 545 F.2d 919 (5th Cir. 1977) (right to file bankruptcy petition not protected.)

There is no allegation that the defendants in this case were motivated by an invidiously discriminatory racial animus, and there is no evidence that would support such an allegation. Indeed, the theory of the plaintiffs' case is that they are the victims of a conspiracy motivated by the defendants' hostility toward nonunion workers of any race and the employers who hire them. We must, therefore, answer the question specifically reserved by *Griffin* and still unanswered in this circuit: does section 1985(3) reach conspiracies founded upon discriminatory animus directed against classes defined by some characteristic other than race?

*Griffin* noted that not all private conspiracies to interfere with the rights of another would come under the protective umbrella of section 1985(3). The Court determined the congressional purpose was to include only those conspiracies animated by an "invidiously discriminatory motivation."

> The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or *perhaps otherwise class-based*, invidiously, discriminatory animus behind the conspirators' action.

403 U.S. at 102, 91 S.Ct. at 1798, 29 L.Ed.2d at 348 (some emphasis supplied). Thus, *Griffin* expressly left open the possibility that a § 1985(3) cause of action existed against private conspiracies inspired by some nonracial class bias.

Encouraged by this suggestion, numerous lower courts have already found that section 1985(3) is not limited to protecting classes defined by race. Indeed, we are aware of no post-*Griffin* decision by a circuit court that has limited the scope of the statute to racially-motivated conspiracies. See cases cited *infra* at p. 723.

Furthermore, extending section 1985(3) protection to include conspiracies motivated by nonracial class animus comports favorably with the Supreme Court's approach to other Reconstruction civil rights statutes in recent years "to 'accord [them] a sweep as broad as [their] language.'" *Griffin v. Breckenridge*, 403 U.S. at 97, 91 S.Ct. at

1796, 29 L.Ed.2d at 345. The expansive language of the statute could reach all conspiracies which deprive any class of persons of equal protection of the laws, not just those animated by racial discrimination. Sections 1981 and 1982, for example, both contain specific references to race, and the courts have consistently limited their application to instances of racial discrimination. *See, e. g., McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) (§ 1981); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) (§ 1982); *Olivares v. Martin*, 555 F.2d 1192 (5th Cir. 1977) (§ 1981). By contrast, however, section 1983 makes no specific reference to race, and a wide variety of nonracial classes have sought and won relief from discriminatory treatment under section 1983. *See, e. g., Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (prisoners); *Johnson v. American Credit Co.*, 581 F.2d 526 (5th Cir. 1978) (debtors attacking state pre-judgment attachment procedure); *Morris v. Michigan State Bd. of Education*, 472 F.2d 1207 (6th Cir. 1973) (sex). Since section 1985(3), like section 1983, is not cast in racial terms, consistency demands that section 1985(3) also be read to protect nonracial classes.

The conclusion that section 1985(3) is not restricted to protecting victims of racial discrimination is also fully supported by the legislative history surrounding the statute's enactment. Both the congressional debates and the original statute's popular title suggest that the protection of groups who were being terrorized by the Ku Klux Klan (blacks and white Union sympathizers) was the Act's primary objective. Although concern for those persons victimized by Klan violence was the most pressing matter leading to adoption of the Act, both proponents and opponents of the legislation understood that it would cover other groups as well. Representative Hoar described the purpose of section 1985(3) as guaranteeing "that under no temptation of party spirit, under no political excitement, under no jealousy of race or caste, will the majority either in

numbers or strength in any State seek to deprive the remainder of the population of their civil rights." Cong. Globe, 42d Cong., 1st Sess. 335 (1871). Senator Edmunds' famous remarks also aptly illustrate the congressional attitude toward what classes would enjoy section 1985(3)'s protection:

We do not undertake in this bill to interfere with what might be called a private conspiracy growing out of a neighborhood feud of one man or set of men against another to prevent one [from] getting an indictment in the State courts against men for burning down his barn; but, if in a case like this, it should appear that this conspiracy was formed against this man because he was a Democrat, if you please, or because he was a Catholic, or because he was a Methodist, or because he was a Vermonter ... then this section could reach it.

Cong. Globe, 42d Cong., 1st Sess. 567 (1871). The congressional debates, which reflect a concern for all groups subjected to the Klan's organized lawlessness, make it appear that the statute's drafters intended to protect groups other than southern blacks.

*Griffin*, the statutory text, companion civil rights provisions, and the legislative history all indicate that a conspiracy motivated by invidiously discriminatory intent other than racial bias is actionable under section 1985(3).

However, the conclusion that section 1985(3) protects nonracial classes resolves only a part of the problem presented by this case, for we must also determine whether the particular class involved here is one which is covered by the statute's protective cloak.

■ Precisely what kinds of nonracial classes enjoy section 1985(3)'s protection is far from clear. *Griffin* presented conduct "so close to the core of the coverage intended by Congress that it is hard to conceive of wholly private conduct that would come within the statute" if it did not. 403 U.S. at 103, 91 S.Ct. at 1799, 29 L.Ed.2d at 348. At the same time, the Court's expressed concern over the broad reach of the statute's literal language dictates the exercise of restraint in defining what nonracial class-based discrimination is covered. Thus, we expressly limit our holding to a determination that section 1985(3) encompasses a private conspiracy against nonunion laborers and their employer. Appropriate development of judicial precedent demands that further delineation of the statute's outer limits must await specific cases.

■ Not every conceivable class of persons is covered by the statute. Members of the plaintiff class must share some common characteristic beyond simply being victims of the defendant's conspiratorial conduct. *See, e. g., Askew v. Bloemker*, 548 F.2d 673 (7th Cir. 1976) (homeowners raided by drug enforcement agents); *Harrison v. Brooks*, 519 F.2d 1358 (1st Cir. 1975) (property owners allegedly injured by city council rezoning efforts). The class cannot be so large and amorphous that its members are virtually indistinguishable from the vast majority of the populace. *See, e. g., Blevins v. Ford*, 572 F.2d 1336 (9th Cir. 1978) (nonlawyers). Even some clearly defined and easily identifiable groups have been denied protected status under the statute. *See, e. g., DeSantis v. Pacific Tel. & Tel. Co.*, 608 F.2d 327 (9th Cir. 1979) (homosexuals); *Carchman v. Korman Corp.*, 594 F.2d 354 (3d Cir. 1979), *cert. denied*, 444 U.S. 898, 100 S.Ct. 205, 62 L.Ed.2d 133 (1979) (tenant organizers); *Lessman v. McCormick*, 591 F.2d 605 (10th Cir. 1979) (debtors); *McLellan v. Mississippi Power & Light Co.*, 545 F.2d 919 (5th Cir. 1977) (en banc) (persons who file voluntary bankruptcy petitions); *Bricker v. Crane*, 468 F.2d 1228 (1st Cir. 1972), *cert. denied*, 410 U.S. 930, 93 S.Ct. 1368, 35 L.Ed.2d 592 (1973) (physicians who testify in malpractice suits).

In the absence of Supreme Court guidance as to the kinds of classes protected by section 1985(3) or a method by which protected classes should be identified, our own en banc decision in *McLellan* provides our gauge. In *McLellan*, we held that the statute does not cover persons who file voluntary petitions in bankruptcy. The decision was based on three factors. First, the legislative history of the Ku Klux Klan Act

contains no evidence of congressional concern about discrimination against persons who become insolvent. Second, while the protection afforded by the civil rights acts is not static, it would be inappropriate to enlarge the group of protected classes to include bankrupts when Congress had specifically declined to prohibit discrimination against them. Third, including bankrupts within the ambit of section 1985(3) would be unwarranted in light of the Supreme Court's refusal to characterize the right to file a bankruptcy petition as a fundamental right. 545 F.2d at 932–33.

■ Applying the *McLellan* factors to our case today, we find that the plaintiffs constitute a class for § 1985(3) purposes.[8] The labor union movement in America was yet to be born when the 42d Congress was in session, so it could not have been specifically concerned with discrimination perpetrated against nonunion laborers. However, the congressional debates evince a hearty regard for persons who are victimized because of their political beliefs and associations. Today's Ku Klux Klan proclaims itself to be a racist organization. But in 1871 it was regarded primarily as a political one. The motives and ambitions of the Klan disturbed the Republicans in the 42d Congress because they feared that its activities would defeat the policies of Reconstruction and deprive the newly emancipated blacks of rights secured to them under the recent amendments to the Constitution. Senator John Sherman of Ohio voiced this concern after he read aloud from a copy of the Klan's secret oath,

showing that here is a political organization, with political ends, political aims; it shows that the object and intent of that political organization is to prevent large masses of the people of the southern States from enjoying a right which has been guaranteed to them by the Constitution of our country.

Cong. Globe, 42d Cong., 1st Sess. 153 (1971). The Klan's political objective formed a recurrent theme in the Senate debates.[9]

The apprehension of Republican senators over the Klan's scheme of terrorizing citizens for their political views and of preventing voters from exercising their franchise also echoed throughout the debates conducted in the House. Representative Ellis Roberts of New York expressed this concern in the following terms:

But one rule never fails: the victims whose property is destroyed, whose persons are mutilated, whose lives are sacrificed, are always Republicans. They may be black or white; they include those who wore the blue and those who wore the gray; newcomers and life-long residents, but only Republicans. Stain the door lintels with the mark of opposition to reconstruction and of hostility to the national Administration and the destroying angel passes by. Omit that sign and the torch may kindle the roof that covers women and children.... Such uniformity of result can come only from design. Republicans only are beaten and mutilated and murdered, because the blows are aimed at Republicans only.

Cong. Globe, 42d Cong., 1st Sess. 412–13 (1871). Other Republican congressman expressed similar views.[10] *See generally*

---

8. Our reliance upon the factors deemed relevant in *McLellan* does not necessarily imply that they are the only relevant considerations. Conceivably, other factors may be regarded as sufficient to include or to exclude other classes from § 1985(3) coverage.

9. *See, e. g.,* Cong. Globe, 42d Cong., 1st Sess. 252 (remarks of Sen. Morton) ("[t]he purpose [of the Klan] is by these innumerable and nameless crimes to drive those who are supporting the Republican party to abandon their political faith or to flee the State."); *id.* at 504 (remarks of Sen. Pratt) (the primary purpose of the Klan "is to punish men for their political

opinions"); *id.* at 702 (remarks of Sen. Edmunds) (the "systematic plan [of the Klan] is not to leave in any of those States a brave white man who dares to be a Republican or a colored man who dares to be a voter").

10. *See, e. g.,* Cong. Globe, 42d Cong., 1st Sess. 72 (remarks of Rep. Blair) (the Klansmen "murder for a difference in political opinions") *id.* at 333 (remarks of Rep. Hoar) (the Klan is a "secret political conspiracy"); *id.* at 391 (remarks of Rep. Elliott) ("the design of the Ku Klux is political"); *id.* at 488 (remarks of Rep. Lansing) ("the Ku Klux in their crimes are inspired by political zeal").

Comment, *A Construction of Section 1985(c) in Light of its Original Purpose*, 46 Univ. Chi.L.Rev. 402, 407–420 (1979).

Thus, whereas *McLellan* could locate no indication of congressional purpose to protect persons discriminated against for filing bankruptcy petitions, the legislative history reflects a pervasive concern for persons conspired against for their political associations. The congressional debates surrounding adoption of the Act therefore provide support for including within the ambit of section 1985(3) those such as the plaintiffs who are punished because of their associations.

Similarly, enlarging the scope of the statute to include nonunion workers who are attacked for their choice to associate with other nonunion workers, thereby enabling an employer to offer significant work to the class, is appropriate in light of subsequently enacted federal legislation. While Congress has specifically refused to prohibit discrimination against bankrupts in legislation it has enacted on the subject, it has manifested a desire to protect laborers who opt not to affiliate themselves with a labor organization. Section 7 of the original Wagner Act provided that

> [e]mployees shall have the right of self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection.

Wagner Act, § 7, 49 Stat. 452 (1935). When Congress passed the original Act, it rejected the argument that parity required granting protection against coercive tactics of labor organizations as well as against those committed by employers. *See* S.Rep. 573, 74th Cong., 1st Sess. 16 (1935).

However, significant change was not long in coming. The 1947 Taft-Hartley amendments to the National Labor Relations Act brought the addition of unfair labor practices by labor organizations. The Taft-Hartley Act retained the right to form, join, or assist labor organizations, but it revised section 7 of the original Act so it

would contain "the right to refrain from any or all such activities." Taft-Hartley Act, § 101, 61 Stat. 140 (1947), currently codified at 29 U.S.C. § 157. Section 8(b)(1) now declares it to be an unfair labor practice for a labor organization or its agents to restrain or coerce employees in the exercise of the rights guaranteed by section 7. 29 U.S.C. § 158(b)(1). Congress has thereby underscored the importance of the right of free association in the labor relations context and has guaranteed the right to a free and untrammeled choice to associate or not to associate with a labor organization. This manifestation of congressional concern for those in plaintiffs' class makes their protection by section 1985(3) particularly appropriate.

Finally, *McLellan* regarded the Supreme Court's refusal to call the right to file a bankruptcy petition a fundamental right as relevant to its own determination that bankrupts are not protected by section 1985(3). By contrast, the Supreme Court has characterized the right of free association as "a right which, like free speech, lies at the foundation of a free society." *Shelton v. Tucker*, 364 U.S. 479, 486, 81 S.Ct. 247, 251, 5 L.Ed.2d 231, 236 (1960). Our legal system honors the freedom of the individual to associate as he chooses because that freedom "tends to produce the diversity of opinion that oils the machinery of democratic government and insures peaceful, orderly change." *Gilmore v. City of Mobile*, 417 U.S. 556, 577, 94 S.Ct. 2416, 2427, 41 L.Ed.2d 304, 321 (1974). The importance of the freedom of association has led the court to call it one of the "indispensable liberties," *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 461, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488, 1499 (1958), which ranks "among our most precious freedoms." *Williams v. Rhodes*, 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24, 31 (1968). The right of association is fundamental in our constitutional scheme of values. Thus, the difference in importance assigned to the right to file a bankruptcy petition and the right of the individual to freely associate with others of his own choosing favors protecting these plaintiffs.

Our determination that the plaintiffs constitute a protected class under section 1985(3) also comports favorably with the construction of the statute given by other courts. The lower federal courts have accorded § 1985(3) protection to two broad categories of nonracial classes. The first category consists of classes whose members are identified with one another by some inherited or immutable physical trait or by a history of past discrimination. See, e. g., *Life Insurance Company of North America*, 591 F.2d 499 (9th Cir. 1979) (women); *Marlowe v. Fisher Body*, 489 F.2d 1057 (6th Cir. 1973) (Jews); *Baer v. Baer*, 450 F.Supp. 481 (N.D.Cal.1978) (members of the Unification Church); *Mandelkorn v. Patrick*, 359 F.Supp. 692 (D.D.C.1973) (Children of God). Women, ethnic minorities, and religious sects are usually included under the statute because they are classes whose members bear no responsibility for their distinctive characteristics or because membership in the class has traditionally inflamed the irrational fears and hatreds of the majority.[11] Thus, they may be regarded as one of the groups which "require and warrant special federal assistance in protecting their civil rights." *DeSantis v. Pacific Tel. & Tel. Co.*, 608 F.2d at 332–33. The plaintiffs cannot claim they are distinguished from other persons by some immutable or inherited physical trait, like race or gender, over which they have no control.

However, courts have also granted protection to classes whose members are discriminated against because of their political beliefs or their associations. See, e. g., *Means v. Wilson*, 522 F.2d 833 (8th Cir. 1975), *cert. denied*, 424 U.S. 958, 96 S.Ct. 1436, 47 L.Ed.2d 364 (1976) (supporters of a particular political candidate); *Glasson v. City of Louisville*, 518 F.2d 899 (6th Cir.), *cert. denied*, 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975) (political demonstrators);

*Smith v. Cherry*, 489 F.2d 1098 (7th Cir. 1973), *cert. denied*, 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974) (voters for a sham political candidate); *Cameron v. Brock*, 473 F.2d 608 (6th Cir. 1973) (supporters of incumbent sheriff); *Action v. Gannon*, 450 F.2d 1227 (8th Cir. 1971) (worshipers at a predominantly white Catholic church disrupted by black civil rights protesters). It is within this second category of classes that plaintiffs fall.

Plaintiffs were denied the equal protection of law because they did not belong to a labor organization or worked for an employer which did not have a collective bargaining agreement and which hired workers without regard to their union membership. One of the unidentified co-conspirators made it clear to the plaintiffs before the destruction began that Port Arthur was a "union town." The plaintiffs were attacked and beaten and property was destroyed because they chose to exercise their right not to join a labor organization and to work with others of the same mind. In view of the foregoing considerations, we hold that the plaintiffs belong to a class protected by section 1985(3).

 Our decision does not imply that every union-nonunion controversy can create a section 1985(3) cause of action. Neither does it imply that every instance of violence arising in the context of a labor dispute will necessarily do so. Powerful limitations exist to restrict an overly broad application of the statute. *See generally McLellan*, 545 F.2d at 940–41 (Godbold, J., dissenting). Section 1985(3) cannot be invoked to disrupt the operation of a carefully integrated statutory scheme. *See Great American Federal Savings & Loan Ass'n v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979) (holding that deprivation of a right created by Title VII cannot form

---

**11.** With respect to women, the Third Circuit has said that "[t]he fact that a person bears no responsibility for gender, combined with the pervasive discrimination practiced against women, and the emerging rejection of sexual stereotyping as incompatible with our ideals of equality" is sufficient to warrant treating gender as a characteristic comparable to race. *No-*

*votny v. Great American Federal Savings & Loan Ass'n*, 584 F.2d 1235, 1243 (3d Cir. 1978), *rev'd on other grounds*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). Similar treatment of religious minorities can be justified because they often provoke the "fear, hatred and irrationality of the majority." *Baer v. Baer*, 450 F.Supp. 481, 491 (N.D.Cal.1978).

the basis for § 1985(3) cause of action). Neither can a § 1985(3) cause of action be predicated upon a simple unfair labor practice. *Cf. United States v. DeLaurentis*, 491 F.2d 208 (2d Cir. 1974) (holding an unfair labor practice not cognizable under 18 U.S.C. § 241, the criminal analogue to section 1985(3)). Unionism or nonunionism in and of itself does not create a covered class. But where, as here, there is no campaign to organize employees and force or violence is used to deprive nonunion workers and their employer of the right to freely associate with one another, a section 1985(3) action will lie.[12]

## IV. THE CONSTITUTIONAL QUESTION: THE SOURCE OF CONGRESSIONAL POWER

■ Having determined that section 1985(3) was intended to provide a civil remedy for the kind of conspiracy involved here, we must respond to defendants' argument that Congress lacks the constitutional power to enact legislation of this breadth. The plaintiffs maintain that section 5 of the Fourteenth Amendment authorizes Congress to provide a civil remedy for this private conspiracy. On the particular facts before us, we hold that the Commerce Clause empowers Congress to reach defendants' conduct and do not reach the Fourteenth Amendment issue.

*Griffin* emphasized that it was unnecessary to test the constitutionality of section 1985(3) in all conceivable applications in order to sustain its facial constitutionality and its application to the facts of any particular case. 403 U.S. at 105, 91 S.Ct. at 1799, 29 L.Ed.2d at 350. *Griffin* also makes clear that section 1985(3) is not unconstitutional merely because it reaches wholly private conspiracies. By the same token, it indicates that a source of congressional power must be identified to warrant application of the statute in each case.

The *Griffin* court concluded that the Thirteenth Amendment and the constitutional right to interstate travel authorized Congress to reach the private conspiracy alleged there. But the court concluded its opinion, stating

> In identifying these two constitutional sources of congressional power, we do not imply the absence of any other. More specifically, the allegations of the complaint in this case have not required consideration of the scope of the power of Congress under § 5 of the Fourteenth Amendment.

*Id.* at 107, 91 S.Ct. at 1801, 29 L.Ed.2d at 351.

The plaintiffs' § 1985(3) action cannot be sustained under the Thirteenth Amendment, for they are neither a racially oppressed group nor suffering in the bonds of

---

**12.** It should be observed that the National Labor Relations Board has a long-established policy against awarding monetary damages for physical injury and property damage caused by strike or picket line violence for which the union is held responsible. *See Union de Tronquistas Local 901 (Lock Joint Pipe & Co.)*, 202 N.L.R.B. 399 (1973); R. Gorman, Basic Text on Labor Law 217 (1976); D. McDowell & K. Huhn, NLRB Remedies for Unfair Labor Practices 99–100 (1976). The Board's refusal to give damage awards is predicated in part upon its view that such awards would unduly interfere with the policy of the National Labor Relations Act to protect concerted activities and that other remedies against union violence are sufficient deterrent. *Union de Tronquistas*, 202 N.L.R.B. at 400. Its practice is also grounded in concern for the proper institutional role to be played by the Board. *See District 1199, National Union of Hospital and Health Care Employees (Frances Scherver Home and Hospital)*,

345 N.L.R.B. 105 (1979) (Board is not equipped to handle personal injury claims); *Union Nacional de Trabajadores*, 219 N.L.R.B. 157 (1975) (awards are punitive and, therefore, not part of the Board's statutory function).

Whatever the basis for the Board's refusal to order compensation for injuries suffered during strike or picket line violence, our decision that section 1985(3) affords a remedy in this case does not offend that policy. In this case, no lawful concerted activity was taking place when the Cross construction site was attacked. There was no organizational campaign, no union demand for recognition, no informational picket, and no collective bargaining in progress. In such circumstances, a civil remedy for damages presents no danger of thwarting the Board's policy. However, whether section 1985(3) should also extend to other conspiracies against nonunion workers and their employers is a question which we expressly pretermit.

involuntary servitude. *See, e. g., Jones v. Mayer*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); *Clyatt v. United States*, 197 U.S. 207, 25 S.Ct. 429, 49 L.Ed. 726 (1905). Neither can it be supported by the right to travel on the present record. Although the plaintiffs alleged that the object of the defendants' conspiracy was to deprive them of the right to interstate travel, they have introduced no evidence to show that either the purpose or the result of the conspirators' acts was to infringe upon their right to such travel.

However, the alternative path suggested by *Griffin* is itself fraught with uncertainty. A major controversy still exists over the extent to which section 5 of the Fourteenth Amendment grants Congress the power to reach wholly private conduct. Particularly, whether section 1985(3) can be constitutionally applied to private, nonracially motivated conspiracies is a question which has divided the circuits. *Compare Action v. Gannon*, 450 F.2d 1227 (8th Cir. 1971) *and Richardson v. Miller*, 446 F.2d 1247 (3d Cir. 1971) (holding that the Fourteenth Amendment authorizes Congress to reach purely private conduct) *with Murphy v. Mount Carmel High School*, 543 F.2d 1189 (7th Cir. 1976) (finding that it does not). Furthermore, no single interpretation of the expanse of Congress's power under section 5 has consistently commanded the adherence of a majority of the Supreme Court. *Compare United States v. Guest*, 383 U.S. 745, 762, 86 S.Ct. 1170, 1180, 16 L.Ed.2d 239, 251 (1966) (Clark, J., concurring, joined by Black and Fortas, JJ.) *and id.* at 782, 86 S.Ct. at 1190, 16 L.Ed.2d at 263 (Brennan, J., concurring and dissenting, joined by Warren, C.J. and Douglas, J.) (suggesting that § 5 empowers Congress to punish purely private conspiracies to deprive Fourteenth Amendment rights), *with, id.* at 753–60, 86 S.Ct. at 1175–80, 16 L.Ed.2d at 246–250 (opinion of the Court by Stewart, J., relying on right to interstate travel) *and id.* at 762, 86 S.Ct. at 1180, 16 L.Ed.2d at 251, (Harlan, J., concurring and dissenting). *See Oregon v. Mitchell*, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970); *Katzenbach v. Morgan*, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966).

We need not depend on this uncertain precedent for congressional power. *Griffin* clearly contemplated that other sources of congressional power might be available to justify other applications of section 1985(3). Indeed, the original proponents of the Ku Klux Klan Act did not base their assertion of congressional power exclusively on the Fourteenth Amendment. *See, e. g.,* Cong. Globe, 42d Cong., 1st Sess. 81 (1871) (remarks of Rep. Bingham) ("It was always competent for the Congress of the United States by law to enforce every affirmative grant of power...."); *id.* at 477–78 remarks of Rep. Shellabarger (referring to the amendment to § 2 "so far as it is not confined to infractions of rights which are clearly independent of the Fourteenth Amendment, referable to and sustained by the old provisions of the Constitution"). On the facts presented in this case, Congress has the authority to reach a wholly private conspiracy under the commerce power conferred by article I, section 8 of the Constitution.

A.A. Cross Construction Company is a general contractor in the building and construction industry. The record indicates that during the year preceding the violent episode of January 17, 1975, Cross had performed work outside of Texas valued in excess of $300,000. During that same period, Cross purchased goods and materials which originated outside of Texas, were used in its operations within Texas, and were valued at more than $50,000. In addition, at the time of the attack on the Alligator Bayou construction site, Cross was performing its obligations under a contract with the United States Army Corps of Engineers.

■ Article I, section 8, clause 3 of the Constitution confers upon Congress the power "[t]o regulate Commerce ... among the several states" and clause 18 of the same article grants it the power "[t]o make all laws which shall be necessary and proper for carrying into execution the foregoing powers...." As the Supreme Court has

pointed out, this grant of power "extends to those activities intrastate which so affect interstate commerce, or the exertion of the power over it, as to make regulation of them appropriate means to the attainment of a legitimate end, the effective execution of the granted power to regulate interstate commerce." *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 119, 62 S.Ct. 523, 526, 86 L.Ed. 726, 732 (1942). "If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." *United States v. Women's Sportswear Mfg. Ass'n*, 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805, 811 (1949). *See United States v. Darby*, 312 U.S. 100, 118, 61 S.Ct. 451, 459, 85 L.Ed. 609, 619 (1941); *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893, 911 (1937). Moreover, that the volume of goods and supplies purchased by Cross or that the volume of business done outside of Texas is comparatively small in terms of the total amount of goods moved or work performed in interstate commerce is not significant. *Katzenbach v. McClung*, 379 U.S. 294, 300–01, 85 S.Ct. 377, 382, 13 L.Ed.2d 290, 291 (1964); *Wickard v. Filburn*, 317 U.S. 111, 127–28, 63 S.Ct. 82, 90, 87 L.Ed. 122, 136 (1942). Judicial inquiry is limited to asking whether Congress had "a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce...." *Katzenbach v. McClung*, 379 U.S. at 304, 85 S.Ct. at 377, 13 L.Ed.2d at 298. And it is not constitutionally relevant that Congress was actually "legislating against moral wrongs" when it enacted the provisions in question. *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 257, 85 S.Ct. 348, 357, 13 L.Ed.2d 258, 268 (1964). Chief Justice Marshall's classic formulation of the extent of congressional power is still viable.

> Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.

*McCulloch v. Maryland*, 4 Wheat. 316, 421, 4 L.Ed. 579, 605 (1819).

By these standards, Congress acted within its constitutional power when it enacted section 1985(3) to reach the private conspiracy involved here. It cannot be denied that the aim of protecting interstate commerce from undue burdens is a legitimate end. Congress could reasonably have determined that violent attacks and vandalism perpetrated on the workers of a construction firm engaged in interstate commerce would have a disruptive effect on the flow of products and services among the states. It is also beyond dispute that the aim of protecting interstate workers in the exercise of their First Amendment associational freedoms is a legitimate end. The means adopted for the accomplishment of these ends, a private civil remedy for damages, is plainly reasonable and appropriate. Section 1985(3) as applied to the facts before us is not prohibited by the Constitution and is compatible with both its letter and its spirit. Whether section 1985(3) can constitutionally be applied to other kinds of wholly private conspiracies to deprive persons of their civil rights is a question for another day.

## V. THE EVIDENTIARY QUESTION: STANDARD OF PROOF AND SUFFICIENCY OF EVIDENCE

### A. The Standard of Proof

▮▮▮▮ The unions contend that they cannot be held liable for unlawful acts committed at the Cross construction site by some individual members of their organizations without "clear proof" that they actually participated in the unlawful conduct, gave prior authorization of it, or ratified the acts after actual knowledge of their commission. This more rigorous standard of proof derives from section 6 of the Norris-LaGuardia Act which provides:

> No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual offi-

cers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.

29 U.S.C. § 106. This statutory standard of proof thus lies somewhere between the traditional burdens of reasonable doubt and preponderance of the evidence. With it, Congress intended to require "clear, unequivocal, and convincing proof" of union involvement in unlawful conduct to impose liability for it. *United Mine Workers v. Gibbs*, 383 U.S. 715, 737, 86 S.Ct. 1130, 1145, 16 L.Ed.2d 218, 234 (1966). Yet, while section 106 requires clear and convincing evidence as to union authorization, participation in, or ratification of the acts allegedly performed by its members, it does not prescribe a different standard of proof for other issues in actions against a union or its officers or members involved in a labor dispute. *Ramsey v. United Mine Workers*, 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971).

The unions also recognize that section 106 is by its own terms limited to cases in which the union is participating or interested in a labor dispute. The Norris-LaGuardia Act defines a "labor dispute" to encompass

> any controversy concerning terms and conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, charging, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.

29 U.S.C. § 113(c). The unions insist that the literal language of section 113(c) squarely covers the conduct at issue here. The persons who planned and executed the attack on the Alligator Bayou construction site were motivated by their resentment of Cross's employment practices and hostility toward its nonunion workers. Because the conspiracy that generated the case was formed around this nonunion animus, the defendants maintain that the controversy out of which this case arose cannot be anything other than a labor dispute.

This approach has a certain superficial appeal. Doubtless the attack on the Cross construction site was conceived in reprisal for the refusal of Cross and his workers to accede to demands that the Alligator Pumping Station project be conducted as a union job. Nevertheless, in construing any congressional enactment it is necessary to interpret the meaning of the words as they are used in relation to the setting in which they were written, with due regard to the mischief which the legislation was designed to remedy. In that light, these unions were not participating in a "labor dispute" as that language is employed in section 113(c) because their activity does not fall within the abuses that Congress intended to prevent.

The Norris-LaGuardia Act was passed in a particular social, economic, and legal milieu. During the early part of this century, federal injunctive powers were often invoked to check the spread of union organization and collective bargaining. But Congress conceived that the courts were being made to play a partisan role in labor-management conflicts, in part because judicial injunctive relief usually did nothing to resolve the underlying industrial dispute. The Norris-LaGuardia Act was intended to curb this unwarranted judicial interference in the struggle between employers and employees. Instead, Congress decided to allow such controversies to be settled through negotiation and through the free play of economic forces.

> The Norris-LaGuardia Act ... was designed primarily to protect working men in the exercise of organized, economic power, which is vital to collective bargaining.... Congress acted to prevent the injunctions of the federal courts from upsetting the natural interplay of the competing economic forces of labor and capital.

*Brotherhood of Railroad Trainmen v. Chicago River and Indiana Rd.*, 353 U.S. 30, 39, 77 S.Ct. 635, 640, 1 L.Ed.2d 622, 628 (1957). Thus, the policy section of the Act stresses the worker's "freedom of association, self-

organization, and designation of representatives of his own choosing" as indispensable to the private settlement of these disputes. 29 U.S.C. § 102. Congress thereby made the use of legitimate economic weapons—the picket, the strike, the boycott—part of the warp and woof of our national labor relations policy. *See generally Boys Markets, Inc. v. Retail Clerk's Union, Local 770,* 398 U.S. 235, 250–51, 90 S.Ct. 1583, 1592, 26 L.Ed.2d 199, 210 (1970); *Milkwagon Drivers' Union v. Lake Valley Farm Products, Inc.,* 311 U.S. 91, 100–03, 61 S.Ct. 122, 127–28, 85 L.Ed. 63, 68–70 (1940); A. Cox, D. Bok, & R. Gorman, Labor Law 60–64 (8th ed. 1977).

One of the special abuses identified by Congress was the use of vicarious liability doctrines under which the misconduct of a few individuals could be attributed to the labor organization that sponsored a strike or picket line. Courts had applied the common law of conspiracy to hold unions responsible not only for the conduct of their authorized agents, but also "for every act committed by any member of a union merely because he was a member, or because he had some relation in the union although not authorized by virtue of his position to act for the union in what he did." *United Brotherhood of Carpenters and Joiners v. United States,* 330 U.S. 395, 419, 67 S.Ct. 775, 788, 91 L.Ed. 973, 991 (1947) (Frankfurter, J., dissenting).

This conspiracy approach to union responsibility could frustrate the labor relations policy chosen by Congress. Imposing liability on the union for the unauthorized lawlessness of its more improvident members would penalize the union lawfully engaged in using the legitimate economic weapons thought necessary for the proper resolution of labor-management conflicts. Therefore, Congress enacted section 106, requiring clear proof of union participation in, authorization, or ratification of unlawful conduct before liability could attach.

However, there is no danger of frustrating the congressional policy favoring collective bargaining and no risk of punishing union engagement in protected activity in the case before us. When the events giving rise to this case occurred, no union had a collective bargaining agreement with Cross, and none was seeking recognition as the collective bargaining representative for Cross's workers. No solicitation or other organizational efforts were in progress to attain representation of the Cross employees. No labor organization was staging an informational picket to publicize Cross's employment practices. In short, there were no legitimate union activities taking place when the Alligator Bayou construction project was attacked. Here, some irresponsible individuals sympathetic to the cause of organized labor in Port Arthur, Texas, simply decided to make the Cross construction project an example for other unorganized companies and nonunion workers in the community. This is not the kind of controversy contemplated by Congress when it required "clear proof" of misconduct by a union "participating or interested in a labor dispute."

On the other hand, a labor dispute does exist where unlawful conduct occurs in conjunction with some legitimate union activity. *See, e. g., Cedar Crest Hats, Inc. v. United Hatters, Cap & Millinery Workers Int'l Union,* 362 F.2d 322, 327–28 (5th Cir. 1966). A labor dispute may also exist even though the otherwise legitimate union conduct is unlawful under some other statutory scheme. *See, e. g., Marine Cooks & Stewards v. Panama Steamship Co.,* 362 U.S. 365, 370–71, 80 S.Ct. 779, 783–84, 4 L.Ed.2d 797, 801–802 (1960); *Order of R. R. Telegraphers v. Chicago & N. W. Ry.,* 362 U.S. 330, 339 n.15, 80 S.Ct. 761, 766 n.15, 4 L.Ed.2d 774, 781 n.15 (1960); *Milkwagon Drivers' Union v. Lake Valley Farm Products, Inc.,* 311 U.S. at 103, 61 S.Ct. at 128, 85 L.Ed. at 70. But neither situation is present here. Our holding, therefore, is necessarily a very narrow one: where a labor organization is accused of engaging in unlawful activity not associated with any on-going legitimate union conduct, the union is not participating in a labor dispute within the meaning of 29 U.S.C. § 113(c). Therefore, since the violence at the Alligator Bayou construction

site did not occur in conjunction with a labor dispute, the clear-proof standard of section 106 is not applicable.

B. *Sufficiency of the Evidence*

The unions finally urge that the evidence adduced at trial is insufficient to support the judgment against them under any standard of proof. After carefully reviewing the entire record, we agree that the evidence does not warrant the district court's finding of involvement in the conspiracy for many of the unions vouched in judgment. However, as to the remaining unions, we cannot say that the factual conclusions reached by the district court are clearly erroneous.

The factual findings made and the inferences drawn by the district court "come here well armed with the buckler and shield" of the clearly erroneous rule embodied in Federal Rule of Civil Procedure 52(a). *Horton v. U. S. Steel Corp.*, 286 F.2d 710, 713 (5th Cir. 1961). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 765 (1948). The appellate court must be especially reluctant to disregard a factual finding based upon the evaluation of testimony that draws credibility into question, *Graver Tank and Mfg. Co. v. Linde Air Products Co.*, 336 U.S. 271, 275, 69 S.Ct. 535, 537–38, 93 L.Ed. 672, 676 (1949); it may not consider the evidence anew, *Zenith Radio Corp. v. Hazeltime Research, Inc.*, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129, 151 (1969); and merely because it might have reached a different result on the same evidence will not justify its setting the district court's findings aside. *United States v. National Ass'n of Real Estate Bids*, 339 U.S. 485, 495–96, 70 S.Ct. 711, 717, 94 L.Ed. 1007, 1016 (1950).

The court below concluded that the assault on the Alligator Bayou construction site "evolved from a meeting held by the Executive Committee of the Sabine Area Building and Construction Trades Council on January 15, 1975, wherein a 'citizen protest' was discussed and a time and place were chosen for such a protest." 461 F.Supp. at 226. However, the evidence in the record does not support this inference. There was nothing unique about the January 15 congregation; it was the Council's regularly scheduled weekly meeting. The minutes of the meeting contain only one cryptic entry which might conceivably be construed to refer to the Cross construction site protest, and it is wholly innocuous.[13] In addition, those union representatives who actually attended the meeting testified that the committee discussed the Cross project and that some members mentioned they had heard of a demonstration to be held on the jobsite the following Friday. The import of their testimony is that the protest had already been conceived several weeks before January 15 and that neither the time nor the place for it were set by the Council. Furthermore, there is no evidence that the Council endorsed the planned protest: no motions were offered and no formal resolutions were adopted. The only connection between the Wednesday meeting and the Friday violence is the nearness in time between the two events. Given the regular sequence of such weekly meetings, this link is too tenuous. As to those unions against which the only evidentiary link is their participation in the January 15 meeting of the Sabine Area Building and Construction Trades Council, the judgment of the district court must be reversed.

An additional fact casts the district court's error into even sharper relief. The court exonerated two unions as to which the only evidence of involvement was their representation at the January 15 meeting, yet it held other unions liable even though the proof against them was no stronger. Furthermore, the district court held the Operating Engineers, Local 450, liable, and that organization neither belonged to the Building and Construction Trades Council

---

**13.** The minutes show that the "good and welfare" of the community were discussed.

nor attended its January 15 meeting nor was otherwise shown to be connected with the violence. The additional evidence relevant to the Operating Engineers is no more compelling. The judgment against the union of Operating Engineers, Local 450, must too be reversed.

However, the situation is different with respect to the United Brotherhood of Carpenters and Joiners of America, Local 610. In mid-summer of 1974, before construction began on the Alligator Bayou project, Cross received a visit in his Houston office from an official of the union. John Wallace, financial secretary and business representative for the Carpenters Local 610, gave Cross his business card and informed him that he wanted the union to furnish laborers for the job. He also asked Cross to sign a union contract. Cross agreed to hire members of Wallace's union but refused to enter into the proposed agreement. Wallace then told Cross that his refusal would "cost him a million dollars."

Wallace had no further contact with the Alligator Bayou project until January 17, 1975, when the attack occurred. On that day, Wallace was present at the highway near the access road which led to the Cross jobsite on at least two separate occasions. More damaging, however, is the fact that Wallace was also observed with Robert Faulk, subsequently identified as one of the principal participants in the violence committed that morning. The two men, riding in Wallace's pickup truck, drove part of the way down the road leading to the construction site, confirmed that the Cross workers had arrived at the scene, and returned to the highway. Shortly thereafter, the mob attacked Cross's workers. Wallace admitted that he was at the highway and that he and Faulk approached the construction site together. Not surprisingly, however, his version is less sinister. He also testified that he saw some members of Local 610 and that, before leaving the area, he expressly instructed them not to engage in any violence. From this evidence, the district court concluded that the union had actually participated in the conspiracy, and we cannot say that his factual inferences and cred-

ibility resolution are clearly erroneous. Therefore, the judgment against the United Brotherhood of Carpenters and Joiners, Local 610, is affirmed.

Similarly, we affirm the judgment against the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Local 195. Bruce Hill, one of two business representatives for the Local, appeared at the Cross construction site shortly after the violence had ended. Fulton Johnson, the Corps of Engineers inspector assigned to the Alligator Bayou project, described Hill's conduct at the scene. He testified that Hill was laughing and joking and that his light-hearted demeanor and remarks were highly inappropriate for the gravity of the situation. While Johnson and a colleague were attempting to take photographs of the damage, Hill repeatedly interposed himself in front of the camera, urging him to take his photograph with a burning trailer behind him. Johnson recalled that Hill sarcastically told them he wanted the photograph to post on the bulletin board at the local so that "he could show his men what not to do."

Hill himself gave a more innocent account of the episode, and denied saying that he wanted the picture for the union bulletin board. His explanation for seeking the photograph was, "I don't know. I guess I am a camera freak. I like to have my picture taken." Although the local's other business representative had attended the January 15 meeting of the Trades Council when the protest was discussed, Hill said he first learned of the events around 8:00 that Friday morning when he overheard some men talking at a grocery store. He stated that he went to the Cross construction site to check on a friend who worked nearby, even though he had never been there to see him before. Although the evidence is sparse, we cannot say that the district court's finding that the Pipefitters Local 195 was involved in the conspiracy is clearly erroneous.

Lastly, we also affirm the district court's finding as to the United Brotherhood of Carpenters and Joiners of America, Local 753. Jay Desormeaux and Curtis Beasley, members but not officers of Local 753, were both observed on the Cross construction site during the violent melee of January 17. Desormeaux recounted a conversation he had with Randy Wylie, assistant business agent for the local, on the preceding Wednesday or Thursday when they discussed the planned protest. Wylie admitted that Desormeaux had called him to ask about the demonstration but denied instructing him to go to the work site. Wylie also admitted seeing Desormeaux at the highway on the fateful Friday morning.

There was still more evidence suggesting that the union had authorized the unlawful conduct. Both Desormeaux and Beasley were named as defendants in this lawsuit. Beasley testified that, after the suit was commenced, Wylie had referred him to the union's own lawyers for representation in matters connected with his part in the violent events of January 17. Desormeaux also stated that he had spoken with both Wylie and W. H. Carr, business agent for Local 753, about obtaining a lawyer and expressed his belief that the union would pay his attorney fees. Carr informed Desormeaux that the union furnishing him with a lawyer would be "the least they could do," since he was a union member. However, Desormeaux knew of no formal arrangement by which the union regularly provided legal services to its members and conceded that the union had never done so for him. Wylie denied talking with Desormeaux about attorney's fees, but, apart from that denial, the union made no effort to rebut this testimony. It did not deny furnishing legal services for its members in actions arising from the violence. The evidence in the record permitted the inference that the union sponsored the attack on the Cross employees and then undertook to lend assistance to its members who were discovered in the unlawful enterprise. The appellate issue is not whether we might have taken a different view had the evidence been presented initially to us. It is whether the district court's determination that the Carpenters Local 753 authorized or participated in the attack is clearly erroneous. It is not.

## VI. CONCLUSION

In summary, we hold that the anti-injunction provisions of the Norris-LaGuardia Act do not deprive the district court of jurisdiction to enjoin violence, and that Congress intended 42 U.S.C. § 1985(3) to provide a remedy for private conspiracies directed at nonracial classes. Specifically, we determine that the statute encompasses a conspiracy designed to deprive nonunion workers and their employer of the First Amendment right to freely associate with one another where that conspiracy does not occur in conjunction with legitimate union activity and is perfected by force and violence. In addition, we hold that the Commerce Clause empowers Congress to reach the private conspiracy involved in the case before us. Furthermore, since this case does not involve a labor union participating or interested in a labor dispute within the meaning of 29 U.S.C. § 113(c), the clearproof standard of 29 U.S.C. § 106 is inapplicable. We conclude that the district court's findings that the Carpenters Local 610, Pipefitters Local 195, and Carpenters Local 753 authorized or participated in this conspiracy were not clearly erroneous. Nevertheless, we find that the evidence of participation in the conspiracy is insufficient to warrant the district court's judgment against the remaining eight unions.

In light of the foregoing, the judgment of the district court is

AFFIRMED IN PART AND REVERSED IN PART.