**J.B. SMITH, Plaintiff-Appellee,**

v.

**Keith HIGHTOWER, et al., Defendants,**

**Hunter B. Brush, Alvin G. Khoury, Alan L. Manning, and Galloway Calhoun, Defendants-Appellants.**

No. 82–2121.

United States Court of Appeals, Fifth Circuit.

Nov. 22, 1982.

Rehearing Denied Dec. 22, 1982.

Charles H. Clark, Tyler, Tex., for Brush & Manning.

Douglas M. Becker, Asst. Atty. Gen., Austin, Tex., for Khoury & Calhoun.

Joe Tunnell, Tyler, Tex., John W. Tunnell, Austin, Tex., Wilton H. Fair, Tyler, Tex., for plaintiff-appellee.

David Crump, Houston, Tex., University of Houston, for Texas Dist. & County Attys. Ass'n.

Frederick M. Schattman, Fort Worth, Tex., for Texas Prosecutors Council.

Before BROWN, WISDOM and RANDALL, Circuit Judges.

WISDOM, Circuit Judge:

This is not a run-of-the-mill case. It involves an action under 42 U.S.C. § 1983 by J.B. Smith, the elected Sheriff of Smith County, Texas, to enjoin removal proceedings and a state criminal prosecution against him. Sheriff Smith has admitted to committing unlawful and reprehensible acts, including pouring gasoline on a car in order to burn it and threatening to kill an investigator of the local district attorney, but he continues to serve in office because the district court enjoined his removal and

prosecution. We must decide whether the district court erred in granting the injunction based on a finding that the proceedings against Sheriff Smith were instituted in retaliation for testimony given by the Sheriff and his deputies in an earlier state prosecution. We conclude that the district court should have abstained from hearing this suit under the doctrine of *Younger v. Harris,* 1971, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669. We reverse.

## I.

The district court found the proceedings against Sheriff Smith were retaliatory based on hostility between the Sheriff's office and District Attorney's office, the manner in which the indictments were brought, and the timing of the indictments. To evaluate these findings, we must examine in considerable detail the series of events which allegedly gave rise to a retaliatory prosecution. In 1976, J.B. Smith was elected Sheriff of Smith County, and in 1980, he was re-elected. Hunter B. Brush served as District Attorney of Smith County from 1967–70 and was elected to this position again in 1978. In August 1979, the United States Attorney for the Eastern District of Texas, John Hannah, began receiving complaints about Sheriff Smith. These complaints included charges that Sheriff Smith was using prison labor on his ranch, that he was selling social security cards to employers of illegal aliens, and that he was using county property for personal purposes.[1]

Hannah asked Brush to investigate these matters. Hannah testified that Brush flinched at the prospect of conducting a criminal investigation against Sheriff Smith out of a fear that it might be perceived as a political vendetta. Brush requested that Hannah investigate these matters, but he would not. Eventually, Charles Carver, an investigator for the District Attorney's office, began to investigate the Sheriff's use of prison labor and other charges against Sheriff Smith. Carver and Brush testified that Brush did not know of Carver's investigation of Sheriff Smith.

During this time, Creig Matthews and Kimberly Ramsey, two undercover agents who were working for the Tyler Police Department, arrested a number of individuals on charges of drug trafficking. Among those arrested was Kenneth A. Bora (who had moved from Dallas to Tyler), an alleged gun dealer, narcotics racketeer, and a dealer exploiting child pornography.[2] On the night of September 15, 1979, an assailant attacked Matthews and Ramsey in their trailer while they slept. According to Ramsey, she was awakened by a shotgun in her face and looked up between slightly parted curtains to see Bora. As she attempted to escape, the assailant fired. Matthews was wounded seriously; Ramsey was injured slightly.

Within minutes, Sheriff's deputies arrived.[3] Sheriff Smith, who was informed of the shooting very soon after its occurrence, asked Texas Ranger Stuart Dowell to assist the Sheriff's department in the investigation of the shooting. The Sheriff did not personally participate in the investigation, but assigned Deputy Tony Richardson to work with Dowell. Dowell and Richardson soon questioned Ramsey's account of the shooting because they did not believe it was corroborated by the physical evidence at the scene of the shooting. Brush found himself embroiled in a controversy between the Tyler Police, who wanted Ramsey's word to be believed, and Dowell and Richardson, who questioned it. Brush took the position that

---

1. No indictments were ever brought against Sheriff Smith based on these allegations of impropriety.

2. Bora was tried three times for the sale of cocaine to Matthews. Two cases ended with a hung jury, and the other ended in a mistrial. Eventually, Matthews and Ramsey pleaded guilty in federal court to perjury when they admitted to "framing" Bora in the drug cases. The extent of Bora's criminal record is unclear,

although he had some prior convictions. The search of Bora's home after the shooting of Matthews revealed a large quantity of pornographic material and hundreds of rifles in boxes.

3. The Sheriff's department had responsibility for the investigation because the attack took place outside the city limits of Tyler.

no arrest should be made until the officers were sure they had the right suspect. The Sheriff arrested Bora only after the doubts of Dowell and Richardson were allayed by the x-rays of Matthews, which showed the shooting could have occurred as Ramsey had stated.

The investigation of the shooting continued, and the grand jury indicted Bora. The District Attorney's Office, however, became concerned when three deputies, who had indicated that Ramsey was certain that Bora had shot her, changed their stories and said that Ramsey was unsure of her assailant's identity on the night of the shooting.[4] Prior to trial, Brush called Sheriff Smith and asked him to straighten out the inconsistencies in the statements of his deputies. Sheriff Smith met with the deputies, confirmed that their statements were the truth, and relayed this information to Brush.

Bora was tried for the shooting of Matthews in May 1980. The defense relied on the deputies' testimony [5] that Ramsey made conflicting statements as to the identity of her assailant [6] and on an expert ballistic report stating that the shooting could not have occurred as Ramsey had described. The prosecution established that the ballistic report was based on incorrect facts that Deputy Richardson had given to the expert. When the prosecution provided the correct facts, the expert stated that the shooting could have occurred as Ramsey had described. The jury resolved any doubts in favor of the prosecution, and Bora received a twenty-year prison sentence.

After the trial, some members of Brush's staff, especially Chris Harrison, were upset about the testimony of some of the deputies. Some staff members also felt that the Sheriff's department and Dowell bungled the investigation.[7] The Sheriff's department had reason to be displeased with Brush's office. At the Bora trial, Harrison attacked the credibility of certain deputies and the reputation of the Sheriff's department. There were also charges that Brush's office wrongfully withheld exculpatory evidence from Bora's defense attorney.

The members of Brush's staff all testified that Brush was conciliatory about the matter. Members of the Sheriff's staff differed in their opinions on how the Bora investigation and trial affected relations between the Sheriff's office and District Attorney's office. Deputies Richardson and England testified that relations went steadily downhill, but they were able to cite only one example of the deterioration.[8] Three other deputies, Bobby Miller, Walter Woodhull, and Shontell Woodhull, did not think that any problems existed or that relationships changed after the shooting, but these deputies were not involved in the Bora investigation.

4. Of the approximately six deputies who arrived at the scene of the crime and later testified at trial, three testified that Ramsey was uncertain as to the identity of her assailant and three testified that she immediately identified Bora. One of the deputies, Dale Linebaugh, stated in his written report prepared on the night of the shooting that Bora was the assailant but later testified at Bora's trial that Ramsey was uncertain of her assailant's identity. Chris Harrison, the Assistant District Attorney who tried the Bora attempted murder case, believed that the three deputies who testified that Ramsey was uncertain of her assailant had lied.

5. Sheriff Smith never testified at Bora's trial for the shooting of Matthews.

6. These deputies also testified that Ramsey's reputation for truthfulness was poor.

7. Harrison testified that the investigation was the most pitiful that he had ever encountered. Harrison stated that the crime scene was trampled. Ranger Dowell had taken a blood-soaked and pellet-riddled pillow from the couch on which Matthews had been shot and had thrown it in the trunk of his car, where it remained for several days until he returned it to Matthews's trailer. In addition, Deputy Richardson provided the ballistics expert with inaccurate information that was unfavorable to the state and delivered evidence reports to the defense counsel that had not been furnished to the District Attorney's office.

8. Deputy England testified that an Assistant District Attorney was reluctant to assist him in obtaining a search warrant for a dog during the football games on New Year's Day. This was the only example given of the coldness exhibited by the District Attorney's office.

During this time, Charles Carver, an investigator on Brush's staff, had photographed the Sheriff's ranch while investigating the charge that the Sheriff was using prison labor illegally. The Sheriff saw these photos and went to Brush's office on February 4, 1980 to discuss the matter with Brush and Carver. The Sheriff, accompanied by a burly deputy with the nickname "Mad Dog" because of sixteen charges of brutality against him, threatened to break Carver's neck and to kill him if he did not keep out of the Sheriff's business.

Carver immediately wanted to file a charge against Sheriff Smith for retaliation or assault. Brush and Carver testified that Brush prevented Carver from filing a charge in an effort to preserve reasonably good working relations with the Sheriff's department. Carver testified that he badgered Brush about the matter, but that Brush remained firm in not allowing him to file a complaint as long as Carver was on his staff. Sheriff Smith testified that he had simply lost his temper and made a fool of himself. The Sheriff soon let Carver back in the Sheriff's office to conduct routine investigations.[9]

In the spring of 1981, a female acquaintance of the Sheriff was charged with shoplifting from Skaggs Alpha Beta, a local Tyler supermarket. The Sheriff, at the request of a friend of this woman, traveled to Dallas in a Sheriff's car to induce officials of Skaggs to drop the shoplifting charges. On May 29, 1981, officials of Skaggs in Dallas traveled to Tyler and filed a complaint against the Sheriff. In their affidavits, the officials maintain that Sheriff Smith offered to buy lunch for the officials he met with to persuade them to drop the charges. The affidavits also state that the Sheriff told officials that he would gain sexual favors from the woman if they decided to drop the charges. On this information, Brush concluded that the Sheriff had committed official misconduct in violation of Tex.Penal Code Ann. § 39.01, and within

three or four days Brush decided to take the matter to the grand jury.

During this time, attorneys for Bora had begun to pursue post-conviction remedies in state court. Allegations had surfaced that Matthews and Ramsey had framed Bora and others on drug charges. Both Matthews and Ramsey pleaded guilty to committing perjury in the drug cases, and this made their testimony in the shooting trial suspect. Bora also contended that the District Attorney's office had suppressed evidence favorable to him.

Bora's writ hearing commenced on June 22, 1981, and it focused on the allegations of suppression of evidence. Bora alleged that Harrison withheld a taped interview of Matthews from the defense which would have shown that Matthews's version of the shooting contradicted that of Ramsey. Bora also alleged that someone suppressed a Tyler police detective's report that was helpful to Bora. According to the report, a man who testified that he saw a car at the crime scene fitting the description of Bora's car had stated earlier that he was unable to identify the car. At the writ hearing, Brush testified that he had never seen the report. Sheriff Smith testified that this report was not in his files and that he had never seen it.

By July 1981, Sheriff Smith had learned that the Skaggs Alpha Beta matter was to be presented to the grand jury. On July 5, 1981, the Sheriff was quoted in the local newspaper as inviting all those with allegations against him to "file them and get on with it". Brush testified that he had learned of several unlawful acts by the Sheriff at this time. Brush got in touch with Phil Fleming, a former deputy sheriff who had given Brush reason to believe that he knew of wrongdoing by the Sheriff. Fleming told Brush that in January 1978 Sheriff Smith attempted to burn a vehicle belonging to a man who had received pro-

---

9. Carver did testify that he was followed by unmarked sheriff's cars after the incident. He also received threatening phone calls even though he had an unlisted number, and the engine of his pickup truck was ruined when someone placed a foreign substance in his motor oil.

bation as his sentence for burning a Sheriff's vehicle. Fleming assisted the Sheriff in this escapade, and he testified that the Sheriff attempted to light the gasoline but was scared off by an approaching vehicle before completing the act. Sheriff Smith admitted that he poured gasoline on the car, but he denied prying open the car window or trying to light a match. The Sheriff testified that he chickened out at the last minute.

Assistant District Attorney James A. Mills testified that John Slagle, a Tyler policeman, in response to Sheriff's statement in the newspaper, told him of an illegal arrangement that Sheriff Smith had with the Casa de Oro Apartments in Tyler.[10] In exchange for a rent free apartment for his girlfriend, the Sheriff sent his on-duty deputies to provide security to the apartments. The Sheriff denied giving special protection to the Casa de Oro Apartments and stated that off-duty law enforcement officers commonly received free apartments in exchange for providing security.

Brush took these matters to the grand jury, and the grand jury returned two sets of indictments. On July 11, 1981, the grand jury indicted Sheriff Smith for the attempted arson of a vehicle[11] and for official misconduct. The official misconduct indict-

ment was based on the Sheriff's use of a county car and telephone for personal affairs, the Casa de Oro arrangement, and the billing of the County for tires that he purchased for personal use. On July 30, 1981, the grand jury indicted Sheriff Smith for his threat to Carver in Brush's office on February 4, 1980, but refused to indict him on the Skaggs Alpha Beta charge.

On July 13, 1981, Brush filed a removal action based on the subject matter contained in the indictments and sought to remove the Sheriff from office temporarily, pending resolution of the permanent removal suit. Judge Alvin G. Khoury[12] temporarily suspended the Sheriff from office on July 16, 1981 pursuant to Tex.Rev.Civ.Stat. Ann. art. 5982.[13] The Sheriff applied to the federal district court for a temporary restraining order preventing his removal from office and for permanent injunctive relief.

In his amended complaint,[14] Sheriff Smith alleged that the criminal proceedings and removal suit were brought in retaliation for the testimony of his deputies against the state in the Bora deadly assault prosecution and for his testimony during the Bora writ hearing. The district court granted the temporary restraining order and enjoined the removal action and criminal proceedings against the Sheriff. The district court held a hearing on the Sheriff's

10. Mills testified that Slagle had come across two deputy sheriffs, Bobby Gorman and Bill Freeman, in the parking lot of the Casa de Oro Apartments on the night of July 9, 1981. Mills testified that Gorman had told Slagle that the deputies were performing a "check-in-passing" patrol of the Casa de Oro at the direction of Sheriff Smith. Slagle did not testify. This information prompted Mills to investigate the Sheriff's arrangement at the Case de Oro.

11. The indictment for arson was amended on August 31, 1981, to charge burglary of a vehicle. At the time of the car incident, there was no criminal statute in Texas covering arson of a vehicle. The burglary charge was based on Fleming's statement that Sheriff Smith pried open the window of the car in order to pour gasoline into it.

12. Judge Galloway Calhoun initially ordered the temporary suspension of Sheriff Smith from office pending final removal proceedings. When the Sheriff correctly pointed out that Texas statutes provide for the appointment of a

visiting, out-of-county judge to conduct removal proceedings, Judge Alvin G. Khoury of Gregg County heard the matter and entered the temporary suspension order on July 16, 1981.

13. Tex.Rev.Civ.Ann. art. 5982 provides that the district judge may suspend temporarily from office the officer against whom the removal petition has been filed.

14. In his original complaint, Sheriff Smith sought a temporary restraining order on the grounds that the proceedings against him denied him due process of law. The district court dismissed this case because the Sheriff could pursue his due process claims in the state court. The district court noted that it might have jurisdiction over the case if the Sheriff could show that the prosecution was undertaken in bad faith or to harass. The district court granted Sheriff Smith leave to file an amended complaint within ten days.

motion for preliminary injunction in December 1981. At the hearing, both parties agreed that the hearing would be a trial on the merits for the issuance of a permanent injunction and that any issue of damages for retaliation should be heard in a separate trial.[15]

Applying *Wilson v. Thompson*, 5 Cir.1979, 593 F.2d 1375,[16] the district court held that Brush undertook the criminal prosecution and removal proceedings in bad faith and in retaliation for the testimony of the Sheriff and his deputies in the Bora trial and writ hearing. The district court permanently enjoined the removal proceeding and criminal prosecution against the Sheriff and restored him to office. The finding of retaliation was based on the hostility between the Sheriff's staff and Brush's staff and on the filing of the indictments against the Sheriff soon after his testimony in the writ hearing.

On appeal, Brush sets forth numerous grounds for reversal.[17] Brush contends that the *Wilson* test for retaliation improperly shifts the burden of proof to the prosecutor to show the prosecution would have been taken irrespective of retaliatory motive once the plaintiff meets the first two prongs of the *Wilson* test. Brush contends that the *Wilson* exception to *Younger* is inapplicable in this case because the Sheriff failed to show the conduct that was retaliated against—his testimony and that of his deputies—is constitutionally protected and because the independent role of the grand jury and judge under Texas law breaks the causal link between a prosecutor's desire to retaliate and the prosecution. Brush contends that even if *Wilson* is valid and applicable, the district court applied it erroneously by refusing to consider the strong evidence of the Sheriff's guilt in determin-

ing if the proceedings against the Sheriff were in good faith. Finally, Brush contends that the district court's finding of retaliation is clearly erroneous.

To these contentions, the Texas Prosecutors Council adds that the district court should be reversed because it failed to require the Sheriff to exhaust available state administrative remedies. The Sheriff contends that the *Wilson* test for retaliation should not be modified and that the district court properly held the proceedings against Sheriff Smith were retaliatory under *Wilson*.

## II.

"*Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny espouse a strong federal policy against federal court interference with pending state judicial proceedings absent extraordinary circumstances." *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 1982, —— U.S. ——, ——, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116, 124. The *Younger* doctrine compels us to maintain a healthy respect for state functions:

> [I]nterference with a state judicial proceeding prevents the state not only from effectuating its substantive policies, but also from continuing to perform the separate function of providing a forum competent to vindicate any constitutional objections interposed against those policies. Such interference also results in duplicative legal proceedings, and can readily be interpreted "as reflecting negatively upon the state courts' ability to enforce constitutional principles."

*Huffman v. Pursue, Ltd.*, 1975, 420 U.S. 592, 604, 95 S.Ct. 1200, 1208, 43 L.Ed.2d 482, 492. The rationale underlying the *Younger* doctrine cautions us not to find exceptions

---

**15.** The parties also consented to the dismissal of Keith Hightower, the foreman of the grand jury that indicted Sheriff Smith, as a party to the lawsuit.

**16.** *Wilson v. Thompson* recognizes an exception to *Younger v. Harris*, 1971, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669, for state court prosecutions that are brought in retaliation for the exercise of constitutionally protected conduct. *Younger* held that federal courts should not

enjoin state court criminal proceedings unless unusual circumstances warranting the federal court intervention exist.

**17.** The amici curiae briefs of the Texas Prosecutor's Council and the Texas District and County Attorney's Association strongly support the position of Brush and urge that the district court be reversed.

to it lightly, especially in a case involving a state interest as important as the prompt removal of corrupt state officials.

The district court enjoined the removal and prosecution of Sheriff Smith based on the "bad faith" prosecution exception to *Younger.* This Court stated the standard for applying this exception in *Wilson v. Thompson,* 5 Cir.1979, 593 F.2d 1375. *Wilson* involved the reactivation of criminal cases placed on the "dead docket" after the defendants in those cases instituted civil suits against police officers who had allegedly beaten them without justification. These individuals alleged that the prosecutions were brought against them in bad faith and in retaliation for their first amendment right to petition for redress of grievances. The Court set out the following test to determine if a criminal prosecution allegedly brought in retaliation for the exercise of constitutional rights should be enjoined:

> The Court should consider whether the plaintiffs have shown, first, that the conduct allegedly retaliated against or sought to be deterred was constitutionally protected, and, second, that the State's bringing of the criminal prosecution was motivated at least in part by a purpose to retaliate for or to deter that conduct. If the Court concludes that the plaintiffs have successfully discharged their burden of proof on both of these issues, it should then consider a third: whether the State has shown by a preponderance of the evidence that it would have reached the same decision as to whether to prosecute even had the impermissible purpose not been considered.

593 F.2d at 1387.[18]

### III.

Brush and the amici curiae contend that the *Wilson* test is no longer the appropriate standard for retaliatory prosecutions and that, even if we should hold it to be viable, the district court applied *Wilson* incorrectly. Brush contends that *Texas Department of Community Affairs v. Burdine,* 1981, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207, casts doubt on the shifting of the burden to the defendant under the *Wilson* test, once the plaintiff establishes that the prosecution was brought at least in part to retaliate for the exercise of constitutionally protected conduct. In *Burdine,* a disparate treatment case under Title VII, the Supreme Court held that the defendant-employer bears only the burden of explaining clearly the nondiscriminatory reasons for its action when the plaintiff has proved a prima facie case of discrimination. The Court concluded that it was impermissible to shift the burden of persuasion to the defendant by requiring him to prove by a preponderance of the evidence that nondiscriminatory reasons for terminating the employee existed and that the person retained in the plaintiff-employee's stead had superior objective qualifications for the position.

Brush argues that the *Wilson* test shifts the burden of persuasion to the prosecution in a manner that violates the Court's holding in *Burdine.* Apparently, Brush would require only that the prosecutor come forth with a clear explanation of non-retaliatory reasons for the prosecution to rebut the inference under *Wilson* that the prosecution was retaliatory. Brush argues that shifting the burden to the prosecutor to show by a preponderance of the evidence that the prosecution would have been undertaken absent the retaliatory motive is inconsistent with the notion that the plaintiff must prove the existence of extraordinary circumstances to fall outside the reach of the *Younger* doctrine.

18. The Court borrowed this test from *Mt. Healthy City Board of Education v. Doyle,* 1977, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471. *Mt. Healthy* was a civil rights action brought under 28 U.S.C. § 1331 and 42 U.S.C. § 1983 in which an untenured teacher sued a school district that declined to rehire him, allegedly because of activities protected by the first amendment. The Supreme Court held that once such a plaintiff shows that the constitutionally protected conduct was a motivating factor in the decision not to rehire him, the employer should have the burden to show "by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct." 429 U.S. at 287, 97 S.Ct. at 576, 50 L.Ed.2d at 484.

■ Although Brush argues strongly, we conclude that the Supreme Court's ruling in *Burdine* does not require us to reconsider *Wilson.* Under *Wilson,* the burden of proving an exception to *Younger* based on impermissible purpose is on the plaintiff. *See Wilson,* 593 F.2d at 1287. *Wilson* shifts the burden of persuasion to the defendant only after the plaintiff has proved the existence of retaliation. The purpose served by shifting the burden to the defendant is to determine if the constitutional violation is causally related to the prosecution that the plaintiff seeks to enjoin. In contrast, the burden on the plaintiff in *Burdine* is not onerous, is rebuttable, and serves to sharpen and focus the factual issues. *See Burdine,* 450 U.S. at 254–55, nn. 7 & 8, 101 S.Ct. at 1094, nn. 7 & 8, 67 L.Ed.2d at 215–16, nn. 7 & 8. The burden of persuasion that the prosecution is retaliatory remains on the plaintiff throughout. This allocation of the burden is consistent with the holding of the Supreme Court in *Burdine* and the notion that the burden of persuading the trier of fact concerning a disputed fact or issue—in this case, retaliation—remains with the party asserting it and rarely shifts. *See* Wigmore's Evidence, § 2489 (Chad.Rev.1981). We reject Brush's contention that the *Wilson* test impermissibly shifts the plaintiff's burden of persuasion to the defendant.

■ Brush's disagreement with the burden of proof under *Wilson* stems from confusing the allocation of the burden of proof with the sufficiency of the evidence to carry the burden. The concern of Brush is that the plaintiff under *Wilson* need show only that the prosecution was motivated "at least in part" by a purpose to retaliate against constitutionally protected conduct in order the prove its retaliation case and shift the burden to the defendant. The "at

least in part" language seems to place a low threshold on the plaintiff to make a case for retaliation.

The "at least in part" language, however, must be read in conjunction with the Court's clear language that the state may have many legitimate reasons for bringing a criminal prosecution and that it is only when the state's purpose in bringing criminal proceedings is to retaliate for the protected conduct that the plaintiff's rights are violated. *Wilson,* 593 F.2d at 1386. Judge Thornberry's concurrence in *Wilson* recognizes that the plaintiff must prove impermissible motive and that under *Younger* "[u]nnecessary federal intrusions can be avoided if the district court scrupulously assures that plaintiffs carry the burden of showing that the constitutionally impermissible purpose was a motivating factor in the decision to prosecute." 593 F.2d at 1390 & n. 3. We conclude that the *Wilson* Court did not mean that any showing of retaliation was sufficient evidence to meet the plaintiff's burden, because this would conflict with the holding of *Younger* that injunctions of state court proceedings are to be granted only in narrow circumstances. In stating that the plaintiff must prove retaliation exists before a preliminary injunction will be granted, the *Wilson* Court contemplated that the plaintiff must prove retaliation was a major motivating factor and played a prominent role in the decision to prosecute.[19]

■ Brush next contends that *Wilson* is inapplicable to this case. Brush correctly points out that the *Wilson* test requires Sheriff Smith to show that the conduct he alleges resulted in retaliation—his testimony and that of his deputies in the Bora writ hearing and shooting trial—is constitution-

19. We also note that the *Wilson* Court's use of the "at least in part" standard reflected that the Court was trying to establish the quantum of evidence necessary to establish the likelihood of success on the merits in order to grant the plaintiff's motion for a preliminary injunction. The standard to show likely success on the merits is obviously lower than that for establishing actual success on the merits during the hearing for a permanent injunction. In

the present case, which involves a permanent injunction and an action on the merits, we conclude that the plaintiff must show that the predominant motivation for prosecuting the action was to retaliate for the exercise of his constitutionally protected conduct. This comports with the policy of *Younger* that a heavy burden rests on any party requesting a federal court to enjoin a state court proceeding.

ally protected.[20] Brush argues that there is no such thing as a constitutional right to testify truthfully in a criminal proceeding and that the first prong of the *Wilson* test is not met. The amici curiae brief of the Texas Prosecutor Council argues that truthful testimony is an obligation which the government demands of the people—not a first amendment right—and that first amendment freedoms are rights held by the people against the government.

We agree with Sheriff Smith that the first amendment protects the right to testify truthfully at trial. The first amendment provides far reaching protection against government censorship of free expression:

> [A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content. [citations omitted]. To permit the continued building of our politics and culture, and to assure self-fulfillment for each individual, our people are guaranteed the right to express any thought, free from government censorship.

*Police Department of the City of Chicago v. Mosley,* 1972, 408 U.S. 92, 95–96, 92 S.Ct. 2286, 2289–90, 33 L.Ed.2d 212, 216–17. To allow a prosecutor to retaliate against trial testimony on the grounds that it was unfavorable to the state would impermissibly restrict the free expression of the witness based on the content of his testimony.

In holding this testimony to be protected, we also consider the right of a defendant at trial to compulsory process and the goal of our criminal justice system to arrive at the truth. These values, along with the first amendment values, would not be served if the fear of retaliatory prosecutions effectively muzzled witnesses testifying on behalf of criminal defendants. We conclude that the first prong of the *Wilson* test is met because the conduct allegedly retaliated against is constitutionally protected.

■ Brush next contends that the *Wilson* test is not applicable because the role of the grand jury and judge under Texas law vitiates a finding of retaliatory motive. Brush argues that a felony in Texas cannot be prosecuted without a valid indictment and that the independent role of the grand jury in investigating felonies and returning indictments breaks the causal chain between Brush's conduct and the retaliatory injury to Smith.[21] Brush alone did not prosecute Sheriff Smith; he presented evidence to the grand jury, and the grand jury commanded him to prepare indictments.[22] Brush also contends that he did not suspend Sheriff Smith from office; Judges Calhoun and Khoury did so.[23]

**20.** In an action arising under 42 U.S.C. § 1983, the plaintiff must establish that he has been denied some right, privilege, or immunity secured to him by the Constitution and laws of the United States. "The first inquiry in any § 1983 suit, therefore, is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.' If there has been no such deprivation, the state of mind of the defendant is wholly immaterial." *Baker v. McCollan,* 1979, 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433, 439.

**21.** Under Texas law, the grand jury has the authority to conduct their own investigations, to subpoena evidence and witnesses, to fail to return indictments sought by the district attorney, and to indict on matters as to which the district attorney has presented no evidence and sought no indictment. Tex.Code Crim.Proc. Ann. arts. 20.09–.10, 20.19, 20.21.

**22.** Brush also notes that the grand jury refused to return an indictment for the Skaggs Alpha Beta incident. The grand jury also conducted an independent investigation and interviewed several witnesses, including Sheriff Smith, before returning any indictments.

**23.** Brush relies on *Smith v. Gonzales,* 5 Cir. 1982, 670 F.2d 522, for the contention that the actions of the grand jury and judge insulate him from charges of a retaliatory prosecution. In *Smith,* the Court held that a police officer charged with making a bad faith arrest under § 1983 is insulated from damages when the facts supporting the arrest are placed before a magistrate who issues a warrant or a grand jury that issues an indictment. The Court in *Smith* was greatly concerned with the police officer's liability for damages for bad faith arrests if not insulated. 670 F.2d at 527. Prosecutors, however, are absolutely immune from damages under § 1983 for violating constitutional rights when they act within the scope of their duties in initiating and pursuing a criminal prosecution. *See Imbler v. Pachtman,* 1976, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128. This concern of the Court in *Smith* is not in this case.

These arguments are not persuasive. The record shows that the role of Brush in the indicting process was pivotal, and we find it unlikely that the grand jury would bring charges on incidents that had occurred over a year before if the district attorney had not prompted them to do so. In addition, this Court in *Fitzgerald v. Peek,* 5 Cir., 636 F.2d 943, *cert. denied,* 1981, 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420, held that the bad faith exception to *Younger* applied when improper influence was exerted on the prosecutor by certain judges to seek the indictments. That the grand jury subsequently brought these indictments was not held to insulate the defendants from a finding that the prosecution was retaliatory. We hold that the role played by the grand jury and judge in the removal of Sheriff Smith does not insulate Brush from a finding of retaliation and bad faith.

Brush's final contention concerning the *Wilson* standard is that the district court applied it incorrectly. The district court refused to consider the strength of the evidence of criminal and official misconduct against Sheriff Smith in determining the issue of whether the prosecution was in good or bad faith.[24] Brush argues that the

district court should have considered the evidence and the seriousness of the offenses because they indicated that the prosecution was appropriate and in good faith. Sheriff Smith contends that the district court merely attempted to focus on the motive of Brush in bringing the prosecution rather than on the guilt or innocence of Sheriff Smith. According to Sheriff Smith, this focus is appropriate under *Fitzgerald* because a showing of bad faith under *Wilson* would justify an injunction "regardless of whether valid convictions conceivably could be obtained."

▌ We conclude that the strength of the evidence and seriousness of the charges should be considered in determining if retaliation or bad faith exists.[25] Strong evidence of criminal violations supports the inference that the prosecutor is fulfilling his duty to bring evidence of criminal activity to the grand jury and not retaliating. This conclusion is supported by *Shaw v. Garrison,* 5 Cir., 467 F.2d 113, *cert. denied,* 1972, 409 U.S. 1024, 93 S.Ct. 467, 34 L.Ed.2d 317, and *Fitzgerald v. Peek.* The *Shaw* Court upheld a finding of bad faith prosecution because a thorough review of the evidence revealed that the grounds for the prosecution were meritless.[26] In *Fitzgerald,*

---

24. With respect to the Skaggs Alpha Beta incident, the district court stated:

> The uncontroverted evidence that the Sheriff exerted these efforts to attempt to persuade supermarket officials to dismiss the charges against the woman is clearly reprehensible. Moreover, the proof that he stated his belief that the grateful woman would grant him sexual favors amounts to gross unseemliness. These flagrant improprieties must, nevertheless, be *disregarded* in the context of this civil action, since the primary motive to be determined is the prosecutor's motive in placing the evidence supporting the allegations before the grand jury.

*Smith v. Hightower,* No. 81–325, slip op. at 16 (E.D.Tex. March 9, 1982) (emphasis supplied). With respect to the Casa de Oro arrangement, the district court stated:

> However, the guilt or innocence of the charges levied against him are not at issue here. Only the defendant's motives in bringing those charges may be addressed in the present action. Of course, the plaintiff may present evidence of the impossibility of obtaining an invalid conviction, to show that the prosecution was brought in bad faith.

Finally, with respect to pouring gasoline on the automobile, the district court stated, "Again, it must be emphasized that the unlawful and deplorable actions of the Sheriff are not at issue here; instead, the motive of the prosecution in bringing charges based on these actions—over two years after they occurred—is the question before the court."

25. *Wilson* makes it clear that the prospects of conviction and the significance of the alleged criminal activity is relevant to the determination whether the prosecution would have been brought absent the retaliatory motive. *Wilson,* 593 F.2d at 1387 n. 22.

26. In *Shaw,* the Court's legal analysis was directed primarily toward resolving whether the mere institution of a bad faith prosecution establishes the requisite irreparable injury necessary to receive injunctive relief. The Court also held that the finding of bad faith was not clearly erroneous after an in depth review of the facts of the case and the strength of the evidence against Shaw.

the Court stated that it is not necessary "for the plaintiff to show that the prosecution could not possibly result in a valid conviction." 636 F.2d at 94. *Shaw* and *Fitzgerald* show that this Court has considered evidence on the prospect of conviction to be relevant. We hold that the district court erred in failing to consider the evidence of crimes and wrongdoing by the Sheriff in determining whether the prosecution was brought in good or bad faith.[27]

## IV.

■■■ Brush's final contention is that the district court's finding of retaliation is clearly erroneous.[28] "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Gypsum Co.,* 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 765, *quoted in Scott v. Moore,* 5 Cir.1981, 640 F.2d 708, 729. *See also Boeing Co. v. Shipman,* 5 Cir.1969, 411 F.2d 365. Brush concedes that his burden of showing that the district court's finding is clearly erroneous is heavy, but argues that the

district court's findings are not supported by the record and are distorted pyramidal inferences.[29] We agree. Our review of the entire evidence has left us with the definite and firm conviction that a mistake has been committed.

The district court's first clearly erroneous finding is that the relationship between the Sheriff's department and the District Attorney was characterized by hostility. There was substantial evidence that the relationship was satisfactory and little evidence to the contrary. The district court ignored the testimony of Deputies Bobby Miller, Walter Woodhull, and Shontell Woodhull that relations with the District Attorney were good before and after the Bora investigation and trial. It also ignored the testimony of Brush and Harrison that the relationship was essentially the same after the Bora trial and investigation, although it was somewhat strained between individuals such as Harrison and Richardson. The only evidence to the contrary was the testimony of Deputy England and Sheriff Smith that the relations had cooled, but these individuals were hard pressed to give any examples of hostility.[30]

27. This holding is consistent with the allocation of the burden of proof in *Wilson.* The second prong of the *Wilson* test requires that the plaintiff prove his case for retaliation. Strong evidence of criminal activity weakens the finding of retaliation and may prevent the plaintiff from carrying his heavy burden on the retaliation prong. If the plaintiff establishes his case for retaliation, the strength and seriousness of the charges remains relevant in determining if the prosecution would have been brought anyway under the third prong of *Wilson. See* note 25, *supra.*

28. The amicus curiae brief of the Texas Prosecutor's Council makes the point that the district court erred in not dismissing this lawsuit on the ground that Sheriff Smith failed to exhaust available administrative remedies. The Texas Prosecutor's Council relied on *Patsy v. Florida International University,* 5 Cir.1981, 634 F.2d 900, which held exhaustion of administrative remedies is a prerequisite to receiving injunctive relief under § 1983 in certain circumstances. We note that the Supreme Court overruled this opinion in *Patsy v. Board of Regents of the State of Florida,* —— U.S. ——, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), and held that exhaustion of administrative remedies is

not a prerequisite to an action under 42 U.S.C. § 1983.

29. Brush also argues that the district court's findings were suspect because the district judge misapplied the *Wilson* standard by not considering the evidence of the Sheriff's wrongdoings in its determination of whether the prosecution was in good faith. It is a well-established rule of this Circuit that the clearly erroneous standard does not apply "when an improper legal standard, or a proper one improperly applied, is utilized by a District Court in arriving at its findings." *Theriault v. Sibler,* 5 Cir.1977, 547 F.2d 1279, 1280. We do not apply this rule in this case because we conclude that the district court's findings are clearly erroneous.

30. England did provide the example that an assistant district attorney failed to assist him in obtaining a search warrant for a dog during the football games on New Year's Day. Sheriff Smith was unable to give specific examples of the "coolness" that he described. Sheriff Smith and Deputy Phillip Megason, by way of affidavit, made reference to the dramatic increase in traffic tickets issued by officers of the Tyler police to the Sheriff's department follow-

There is also little evidence that hostility, if it existed at all, extended to Brush and Sheriff Smith. In fact, the evidence shows that Brush's paramount concern was to maintain good relations with the Sheriff. Brush was reluctant to investigate the Sheriff's alleged wrongdoing when Hannah requested him to do so, because he did not want to damage the relationship of his office with the Sheriff. The evidence also contradicts the district court's finding that Brush sided with the Tyler Police against the Sheriff during the Bora investigation. Everyone who testified stated that Brush had little to say during these meetings and that Brush took the consistent position that no arrest should be made until the officers were sure they had the right man.

After the Bora trial was over, Brush attempted to quell any bad feelings on the part of his staff against the Sheriff's Department that arose out of the trial and investigation. Finally, Brush would not allow Carver to bring a charge on the Sheriff's threat to kill him while Carver remained on his staff, because Brush wanted to maintain good relations with the Sheriff. The error of the district court was to attribute to Brush the various emotional reactions of his assistants that occurred at different times and to conclude that this hostility stemmed from the Bora investigation and trial. This conclusion is contradicted by overwhelming evidence that the role of Brush was one of a level-headed peacemaker who desired good relations with the Sheriff.[31]

The district court's willingness to conclude that any bad feelings between the Sheriff's department and District Attorney's office arose out of the Bora investigation and trial is also unwarranted. Much of

the ill will that did exist between the two offices stemmed from Assistant District Attorney Harrison's dislike of Deputy Richardson. Harrison thought that Richardson was incompetent, but this conclusion did not stem solely from the Bora investigation. Harrison testified that Richardson failed to preserve fingerprints linking the suspect to the victim in a capital murder case and that Richardson caused a case to be dismissed because he failed to bring a case to the District Attorney's office within the required time period after the arrest. Given this apparent level of incompetence, we can understand Harrison's frustration with Richardson. Similarly, we can appreciate that ill will may have arisen in Brush's office out of the Sheriff's threat to kill Carver. Our point is not that the Sheriff's department was bad, but that there were incidents unrelated to the Bora matters that gave rise to ill feelings between some members of the Sheriff's department and Brush's staff. To attribute all of the hard feelings of the various parties to the testimony of the Sheriff and his deputies at the trial and writ hearing—which must be the focus of this Court because it is the constitutional conduct allegedly retaliated against—was clearly erroneous on the part of the district court.

The final flaw concerning the district court's finding of hostility relates to the nature of the conduct allegedly retaliated against. The district court placed great emphasis on the fact that certain deputies testified adversely to the prosecution in the Bora trial. The district court overlooks that the majority of the deputies who testified confirmed Ramsey's positive identification of Bora at the scene of the crime on the night the shooting occurred. The dis-

---

ing the Matthews shooting investigation. Although the district court relied on the increase in traffic tickets as evidence of hostility, we fail to understand how the hostility of the Tyler police can be attributed to Brush's office. There is no evidence to support the district court's conclusion that the Tyler police and the district attorney's office acted in concert against the Sheriff's department.

**31.** Sheriff Smith testified that he asked Brush after the writ hearing why the two men did not get along. Brush allegedly replied that Sheriff Smith allowed his deputies to lie on the stand and that Deputy Richardson did not deserve to wear a badge. Brush's version of the same conversation was that the two men discussed the Skaggs Alpha Beta incident and that he did not chastise Sheriff Smith. The district court found this testimony to be self-serving and gave it little consideration.

trict court also ignored that Brush and Smith played no role in the Bora investigation and that Smith did not even testify at Bora's trial. The only testimony of Smith was at the writ hearing. The district court stated that Sheriff Smith "called into question the ability and effectiveness of the Tyler Police and the Criminal District Attorney to formulate and execute an investigative plan." Contrary to this finding, the testimony of Sheriff Smith dealt with whether or not a certain report was in the investigation file on the Matthews shooting and criticized no one. It is unlikely that the innocuous testimony of the Sheriff combined with the testimony of his deputies, which was more favorable to the state than not, is the kind of testimony that would lead to retaliation. The mixed nature of the deputies' testimony does not support the district court's finding that Brush considered the Sheriff and his deputies a hostile, recalcitrant aggregate.

We conclude that the district court's finding of hostility and antagonism arising out of the Bora investigation, trial, and writ hearing is clearly erroneous. At best, the evidence shows that some members of the District Attorney's office and Sheriff's department had disagreements with each other over various matters. There is little evidence that Brush or Sheriff Smith shared any of these hard feelings, and substantial evidence exists that Brush did not have any animosity or vindictiveness toward Sheriff Smith. The district court also failed to acknowledge that, generally speaking, the relationship between law enforcement agents and prosecutors is and must be inherently tense. Texas Ranger Dowell testified that honest disagreements arise during investigations that cause people to become upset, and Brush stated that irritations and misunderstandings commonly

arise among law enforcement agencies and district attorneys. We conclude that the policy in *Younger* cautions us not to elevate isolated incidents that occur in an inherently tense situation into findings of hostility and vindictiveness when a prosecutor faces the delicate task of removing an official charged with corruption. We therefore hold that the finding of pervasive hostility between Sheriff Smith and Brush was clearly erroneous.

■ The district court also based its finding of retaliation on the timing of the indictments. The district court relied on the closeness of the indictments to the Bora writ hearing and on the "stale" nature of the charges as strong evidence of retaliation. The district court repeatedly concluded that Brush knew of the subject matter of the indictments long before Brush testified that he knew of them. We conclude that these findings of the district court are clearly erroneous.

First, there was clear evidence that Sheriff Smith in the presence of Deputy Fleming attempted to pour gasoline in a car and burn it. Fleming testified that he volunteered information to Brush only two or three days before the grand jury met. Brush, who thought that Fleming knew of some wrongdoing by the Sheriff based on an earlier conversation with Fleming, testified that he never knew of the incident until Fleming told him two or three days before the grand jury met. Rather than believe this testimony, the district court relied on a statement by former Assistant District Attorney Jim Walker to conclude that it was untrue. Walker stated that he might have heard someone mention some gossip at a holiday cocktail party in late 1979 or early 1980 about the Sheriff burning a car.[32] Despite Walker's disclaimer

32. After persistent prodding by the district court, Walker stated:

> To the best of my knowledge—Your Honor, I can't really say, and this might be totally inaccurate. It's just when you asked me to try and press myself, I think it was at a Christmas party or New Year's Eve party at Randy Gilbert's house who was a former Assistant District Attorney, and there were—

> it might not even have been a Christmas party. It might have been a party in the fall, but there were several people from the Sheriff's office there, several former Assistant District Attorneys, and he had a keg of beer in the back yard and we had some barbecue. We were just sitting around at this table just talking, and I don't remember if it was Randy Gilbert that stated it to me or someone else

that he was unsure of this statement, the district court inferred not only that Walker knew that the incident occurred but that Brush knew of it because "the occurrence was a topic of casual conversation among his subordinates." This conclusion, based solely on Walker's vague and speculative testimony, is nothing more than a tenuous chain of inferences unsupported by the evidence or reason, and it is clearly erroneous.

Second, the district court found that the district attorney's office had knowledge of Sheriff Smith's arrangement with the Casa de Oro Apartments more than just a few days before the grand jury met on July 11, 1981. Brush testified that he learned of the Casa de Oro arrangement just before the grand jury met from his Assistant Jay Mills. Mills testified that he had learned of this arrangement from John Slagle, a Tyler police officer, two or three days before the meeting of the grand jury.[33] The district court rejected this testimony and instead concluded that Mills testified he had heard rumors of the Sheriff's arrangement with the Casa de Oro prior to the report from Slagle, but failed to investigate them. In fact, Mills testified that he had heard "*vague rumors* that [Sheriff Smith] had had an apartment somewhere", that he could not recall that these *rumors* were related to the Casa de Oro Apartments, and that he did not know how Sheriff Smith made these arrangements. If Mills's testimony is read in its entirety, it is apparent that Mills had *nothing he could have investigated until Slagle came forward* and told him of the Sheriff's arrangement, his method of gaining the free apartment, and the location of the apartment. There is nothing in the record showing that the District Attorney's office had evidence of wrongdoing until Slagle came forward.[34] Indictments or in-

vestigations are not made on vague rumors, especially when an important public official is involved. The district court was clearly erroneous in concluding that Brush had any basis for indicting Sheriff Smith on the Casa de Oro arrangement until two or three days before the grand jury met.

Third, the district court found the indictment based on the threat to kill Carver to be a stale charge that would not have been brought if not for Brush's desire to retaliate. It is undisputed that Brush knew of this incident in February 1980 because he was present when the threat was made. Brush and Carver both testified that Brush would not allow Carver to bring his charge against Sheriff Smith until Carver left Brush's employ. They also testified that Brush barred Carver from bringing the complaint because he wanted to preserve relations with the Sheriff as long as possible. When Carver resigned and insisted upon filing a complaint, Brush took the matter to the grand jury.

The district court found this explanation "past comprehension" and concluded "[I]t is manifest that Brush would not have presented the retaliation charge to the grand jury, if the Sheriff and his deputies had not testified in the Bora writ hearing." We fail to understand the district court's rejection of this explanation. There is nothing inherently wrong with Brush's explanation that he thought it would be unseemly for one of his own employees to bring charges against the Sheriff, and nothing in the record supports the contrary conclusion with the possible exception of Harrison's use of the Carver incident at Bora's trial to undermine the credibility of the Sheriff's deputies.

that was at the party, or it might even have been one of the Sheriff's deputies, but I can't remember who spoke the words, but to the best of my knowledge I heard it first at the party.

**33.** *See* note 10, *supra.*

**34.** Once Slagle did come forward, the district attorney's office gained more reason for suspicion about the Casa de Oro arrangement. Mills testified that Ranger Dowell told Brush and

him that members of the Sheriff's Department were destroying "check in passing" cards for the Casa de Oro apartments. These cards were filled out every time a deputy checked an apartment complex, and they showed who requested the check. Mills obtained a subpoena for the cards from Judge Calhoun after Dowell reiterated his information on the destruction of the cards to the judge.

The district court concluded that the Casa de Oro arrangement and attempted car burning incident were known to Brush long before Brush testified that he knew of them. The district court viewed these incidents along with the Carver incident as stale charges that Brush dredged up to retaliate against Sheriff Smith. We conclude that Brush did not know of the Casa de Oro arrangement or the car incident until shortly before the grand jury met and that Brush's explanation of why he delayed bringing the Carver incident to the grand jury to be logical and consistent with his ongoing attempt to preserve good relations with the Sheriff. We hold that the district court was clearly erroneous in considering the timing of the indictments based on these incidents to be strong evidence of retaliation.

The last significant basis[35] for the district court's finding of retaliation is that Brush amended his removal petition to add the Skaggs Alpha Beta charge even though the grand jury refused to indict on this charge. The district court found this to reek of retaliatory motive despite its finding that the Sheriff's conduct was reprehensible and that Brush acted in good faith in bringing it to the grand jury. We note that a conviction is not necessary to justify removal under Texas law, but that only "official misconduct" need be shown. Tex. Rev.Civ.Stat.Ann. arts. 5970, 5973. This incident provides a basis for removal, and Brush's inclusion of it in the amended petition is merely his attempt to present the best case possible against an official with strong evidence of corruption against that official. The district court's finding that Brush's amendment of the petition to include this charge "reeks of retaliation" is clearly erroneous.

Our close examination of the record reveals that the district court elevated isolated incidents between certain members of the Sheriff's staff and Brush's staff into a finding of hostility between the Sheriff and Brush. It also reveals that the district court equated rumor and gossip with knowledge of concrete offenses for which the Sheriff should have been indicted. The district court bolstered these inferences by ignoring the substantial evidence of wrongdoing by the Sheriff and the unconverted fact that the indictments were issued only after the Sheriff publicly challenged the district attorney and the citizenry to come forward with charges. The district court also placed undue weight on insignificant facts, such as the wording of the indictment and the manner of conducting the suspension hearing. Although there is some evidence to support the district court's finding, this Court "reviewing on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Scott,* 640 F.2d at 729. We infer that Brush was faced with mounting pressure from the community and from other law enforcement agencies to indict Sheriff Smith based on his propensity to commit reprehensible acts. We hold that the district court's finding that Brush brought criminal proceedings and the removal action against Brush to retaliate for his testimony and that of his deputies during the Bora legal proceedings is clearly erroneous.

## V.

The final prong of the *Wilson* test is to determine if the state has shown by a pre-

---

**35.** The district court also relied on less significant incidents as evidence of retaliation. The district court concluded that describing the benefit that the Sheriff received from the Casa de Oro Apartments as "a happy girlfriend, to wit: Treva Loynell Sandell, a/k/a 'Toy' ", was meant to be prejudicial. This language, however, certainly sets forth a benefit as required by Texas Penal Code § 39.01, and it appears from the record that Ms. Sandell was commonly referred to as "Toy." *See* Testimony of Pat Clay, Record on Appeal, Vol. 4 at p. 250. The district court also found that the manner in which the Sheriff was suspended temporarily from office illuminated Brush's improper motive. The district court found it significant that the Sheriff did not know of the hearing even though the media knew of it. We fail to see the relevance of this evidence to a finding of retaliation. The Texas statute under which the Sheriff was suspended did not require that he be present. *See* Tex.Rev.Civ.Ann. art. 5982. There is no evidence that Brush attempted to make the hearing a media event. We find this incident to be insignificant as evidence of retaliation.

 

ponderance of the evidence that it would have reached the same decision to prosecute even had the impermissible purpose not been considered. The district court held that Brush presented no "credible evidence that would tend to show that he would have prosecuted the plaintiff regardless of the fact that plaintiff and his deputy testified adversely to the state." We need not reach this issue because of our holding that the prosecution of Sheriff Smith was not retaliatory. Nevertheless, we consider it important to point out that the substantial evidence against the Sheriff, the seriousness of the charges, the coming forth of citizens with complaints against the Sheriff, and the recent knowledge of the District Attorney's office of many of the charges clearly support a holding that this prosecution would have been brought even if we had concluded there was substantial evidence of impermissible motive. We are concerned that district courts not allow the bad faith or retaliatory prosecution exception to the *Younger* doctrine to swallow the rule of that case. For this reason, we are compelled to point out our disagreement with the district court's finding that there was no evidence that this prosecution would not have been brought even if retaliation had been found.

## VI.

This case vindicates the soundness of *Younger v. Harris.* There are other cases where that is arguable. We conclude that our holding is warranted by the facts of this case and the strong policy against federal intervention in state court proceedings. The compelling interest of the State of Tex-

as in removing corrupt officials is manifest, and it is an interest that *Younger* commands us to respect. *Younger* cautions us that we should not find retaliation based on isolated incidents evidencing friction between a district attorney and sheriff because such incidents could probably be discovered in most cases involving corrupt officials. We can hardly expect friction-free relationships between corrupt law enforcement officials and the local prosecutor. Official corruption cases are particularly difficult to investigate and prove, and prosecutors are undoubtedly reluctant to bring proceedings against local law enforcement agents with whom they must work. *Younger* again cautions us to understand that district attorneys may take their time in removing officials because damage to reputations is enhanced in well-publicized cases involving public figures.[36] If, however, *Younger v. Harris* were not on the books, traditional principles of comity and prosecutorial discretion would, on the facts in this case, compel federal courts to stay out of the State's criminal prosecution of Smith.

We REVERSE the judgment of the district court and VACATE its order enjoining the state proceedings against Sheriff Smith. The mandate shall issue forthwith.

**36.** Our holding recognizes that prosecutors have been allowed discretionary power to decide whether or not to bring charges and when to bring charges. See *United States v. Cox,* 5 Cir. 342 F.2d 167 (en banc), *cert. denied sub nom. Cox v. Hauberg,* 1965, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700, recognizing the discretion of the prosecutor in deciding whether to prosecute. *Cf. Bordenkircher v. Hayes,* 1978, 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604, 611, stating in a prosecutorial vindictiveness case that "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the

decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." In this case, Brush exercised his discretion by waiting until he had firm evidence of wrongdoing by the Sheriff. We understand the reluctance of Brush to indict the Sheriff until he had more than gossip or unconfirmed rumor to base the indictment on. Once that point was reached, Brush exercised his discretion in attempting to dispose of all the allegations against the Sheriff just as the Sheriff requested.